In re Tony B. NGUYEN, Debtor.

AT&T Universal Card Services, Inc., Plaintiff,

v.

Tony B. Nguyen, Defendant.

Bankruptcy No. 97–50321–ASW. Adversary No. 97–5185.

United States Bankruptcy Court, N.D. California, San Jose Division.

April 14, 1999.

Edmund J. Sherman, Law Offices of Robert S. Lampl, Woodland Hills, CA, for Plaintiff.

Tan N. Duong, Law Offices of Tan N. Duong, Milpitas, CA, for Defendant/Debtor.

## MEMORANDUM DECISION HOLDING DEBT DISCHARGEABLE AND AWARDING ATTORNEY'S FEES TO DEFENDANT

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

### INTRODUCTION

This matter came before the Court on the complaint filed by AT & T Universal

Card Services, Inc. ("Plaintiff") against Debtor Tony B. Nguyen ("Defendant"), pursuant to 11 U.S.C. § 523(a)(2)(A), seeking to hold non-dischargeable the sum of $9,419.72, including interest, plus costs and attorney fees.

The case was tried before the Court. Plaintiff was represented by Edmund J. Sherman, Esq. Defendant was represented by Tan N. Duong, Esq. ("Duong"). Plaintiff called as witnesses, Ms. Bobbie Holly ("Holly"), an employee of Plaintiff, and Defendant. Defendant called himself as a witness. Following the trial, the Court announced its intention to rule in favor of the Defendant and explained that it would issue its findings of fact and conclusions of law at a later date. The Court requested that the parties attempt to resolve among themselves the issue of whether Defendant is entitled to recover his reasonable attorney's fees under 11 U.S.C. § 523(d), with the knowledge that the Court intended to rule for Defendant on the merits of the lawsuit. Counsel filed a "Joint Statement Regarding Attorney Fees Issue," explaining that they were unable to resolve that issue.

The Court then issued a Memorandum Decision finding the charges at issue in this case are not excepted from discharge under 11 U.S.C. § 523(a)(2)(A), but reserving the issue as to whether Defendant was entitled to his attorney's fees for defending this action. The Court stated that it would issue a judgment on the liability issue after the attorney fee issue was resolved.[1]

This "Memorandum Decision Holding Debt Dischargeable and Awarding Attorney's Fees to Defendant" supersedes and replaces the Court's previously issued Memorandum Decision. It deals with both the merits of the action and Defendant's request for attorney's fees.

## I. FACTS

Debtor is an elderly man (75 years old as of the date of trial), formerly of Vietnam. He speaks and understands English with some difficulty.[2] He is retired and has not worked since 1991. Defendant testified that he has memory failures and that, as an example, he sometimes does not remember the key to the room where he lives. He also testified that he has a heart condition and a very high cholesterol level.[3] He rents a room in a house which he

1. The Court, by separate Order, directed counsel for Defendant to serve and file a declaration as to the amount of attorney's fees incurred in this matter, together with an itemization or breakdown of charges. Defendant was allowed, but not required, to file a brief on the attorney fee issue. The Plaintiff was allowed, but not required, to respond to Defendant's counsel's declaration (and pleading if one was filed). Defendant was allowed to file a reply.

Counsel for Defendant timely filed his "Declaration of Tan N. Duong, Esq. Regarding Defendant Tony B. Nguyen's Attorney's Fees." Over a month after the deadline required by the Court's scheduling Order, the Court received in Chambers, by facsimile reproduction, a responsive pleading by Plaintiff. Plaintiff did not seek leave of Court to submit a late response. Plaintiff also neglected to *file* its pleading with the Clerk's Office. Counsel for Plaintiff also did not seek prior Court approval to fax a copy of his pleading to Chambers as required by the undersigned. Defendant filed an objection to Plaintiff's response, asking the Court to disregard it as untimely. The undersigned did not receive a copy of that document in Chambers until two and a half months later, because it did not state, on the face of the document, that the matter was "under submission."

The Court decided to consider Plaintiff's response even though it was tardy. No prejudice was alleged by Defendant in his objection to the late pleading.

Accordingly, the Court ordered Plaintiff to *file* its response and, to be fair to Defendant—who could not have known whether or not the Court intended to consider Plaintiff's late filed response—the Court allowed him additional time to file a reply. No such reply was filed.

2. After trial began, Plaintiff offered to adjourn and continue the trial in order to engage a Vietnamese interpreter at Plaintiff's expense. Defendant declined and stated that he believed he could understand counsel for Plaintiff's questions and preferred to proceed with trial as scheduled.

3. He testified about his physical condition as part of his explanation as to why he was declining Plaintiff's offer to continue the trial

shares with a friend; his share of the room rental is $200 per month. He is not married and has no family in the United States.

### A. Defendant's Income and Expenses

Defendant testified that he receives a retirement benefit of $440 per month plus Social Security benefits (SSI) of $220, for a total monthly income of $640 per month. This testimony was not contested by Plaintiff. Defendant's Bankruptcy Schedule I reflects a total monthly income of $633 per month and his Bankruptcy Schedule J reflects total monthly expenses of $600. Trial Exhibit 1.

### B. The AT & T Card

Plaintiff "pre-approved" Defendant for an AT & T Universal Gold MasterCard ("AT & T Card") with an $8,000 credit limit shortly before January 1996. Plaintiff solicited Defendant by sending him written notification of such pre-approval. Defendant accepted the pre-approved card by filling out a brief form that asked for his income and signature. It was unclear whether the form, which was not entered into evidence, asked for any other information from Defendant. Although the completed form was not made part of the trial record, it was certainly available to Plaintiff, and the Court finds, based on the evidence before it, that Defendant reported his income to Plaintiff as $640 per month.[4]

### 1. AT & T's Approval Process

Holly, Plaintiff's second witness, had worked for Plaintiff for 32 years as of the trial date. Her position is that of "Investigations Manager." She has worked in the credit card section of Plaintiff since that

for the purpose of bringing a Vietnamese interpreter to Court.

4. Plaintiff's witness, Holly, apparently had with her at trial a copy of the form Defendant sent back to Plaintiff, but stated that Defendant's income was not legible on her copy.

section's inception in 1990. She is familiar with the section's books and records, including storage of information. She has been trained in Plaintiff's credit granting procedures. She testified that she was familiar with the criteria used by AT & T to offer a particular credit card, and to establish a credit limit, for a particular customer.

Holly stated that before offering potential customers a credit card, Plaintiff checks their credit rating through a "credit scoring mechanism" prepared by the Fair Isaacs Company ("FICO"). FICO is in the business of analyzing credit factors electronically for the credit industry in general, including banks and credit card companies, not just for Plaintiff. FICO compiles this credit information from the Credit Bureau and provides such information to its clients. The top FICO score is 800.

### 2. AT & T's Basis for An $8,000 Credit Line

Defendant's FICO score was 776 in January 1996 or just before.[5] Holly testified that a FICO score of 776 meant that Defendant was handling credit properly and had no negative credit history. Plaintiff's decision to offer Defendant "pre-approved" credit was based on this score and an additional check Plaintiff performs—to make sure someone is not in Plaintiff's "fraudulent file." These two checks are done by Plaintiff on every candidate for credit.

Holly acknowledged that Plaintiff's normal practice was to provide $8,000 in credit if a person had a high FICO score and was not in Plaintiff's "fraudulent file," even if his/her income was very low.[6]

5. Trial Exhibit 10, which was compiled by Plaintiff's employees, relates to the account of Defendant. It shows that his FICO score was 776.

6. Holly was not, however, able to explain the mechanism by which Plaintiff decided to offer Defendant $8,000 in credit, rather than more or less than that amount. She was ques-

Plaintiff did not know Defendant's income when it pre-approved him for a credit card with an $8,000 limit. However, Plaintiff did know that Defendant's income was only $640 per month when Defendant returned the completed pre-solicitation form. Thus, Plaintiff knew Defendant had an income of only $640 per month before Plaintiff actually provided any credit to him, yet still issued a card with a credit limit of $8,000.

Holly's testimony was unclear and somewhat inconsistent as to what additional information Plaintiff had before granting credit to Defendant. At one point she stated that Plaintiff did not know what Defendant's assets were; whether he owned a home, or what his debts were for example. At another point, she indicated that Plaintiff would have had access to at least some of this information from the Credit Bureau (*e.g.*, what Defendant's experience with credit cards had been and what his credit limits were on his other credit cards). When Plaintiff decided whether to offer Defendant credit and what his credit limit should be, it also reviewed, or had access to, his Credit Bureau report.

Plaintiff also knew that Defendant was unemployed before sending Defendant the AT & T card; Holly stated that such information came back on his pre-solicitation form.[7] She also conceded that if someone's income was $640 per month and he was 75 years old, it would be safe to assume that he was unemployed. Plaintiff did not know how long Defendant had been unemployed. Holly admitted that, as far as Plaintiff knew, Defendant might have just retired and might have earned considerably more money in the

years prior to Plaintiff's solicitation of him. (Although Holly was not sure what the poverty line was, she thought Defendant's income was below that line).

Holly further explained that FICO does not score for a particular amount of debt. A FICO score would not tell Plaintiff, for example, the *amount* of debt that someone had handled in the past—whether such debt was $100, $1,000, $10,000, $50,000, or more. It only would tell Plaintiff how well a person handled the amount of debt that he/she had. For that reason, a person might be rated with a very high FICO score even though he/she had only ever borrowed very small amounts of money, like $50 or $75.[8]

### 3. AT & T's Procedure for Handling Charges Exceeding a Customer's Credit Limit

Holly testified that when Plaintiff's "good" customers reach, and then seek to exceed, their credit limits, Plaintiff's policy is to allow them to exceed such limits so as not to embarrass them, and then "deal with them later," if the amount sought is not significantly over their limits. Here, Plaintiff allowed Defendant to exceed his credit limit by over $1,175 on an $8,000 line of credit, which Holly testified *was* significant. Holly's explanation as to why Plaintiff allowed Defendant to exceed his limit was simply that Plaintiff did not want to "embarrass" its customers.

### C. Defendant's Use of the AT & T Card: The Charges at Issue

Defendant used the AT & T card beginning in January 1996. Trial Exhibit 2 consists of *some* of Plaintiff's records of Defendant's AT & T credit card bills for

---

tioned about Trial Exhibit 10 (Plaintiff's internal credit form) but did not know what "income: 62" or "limit: 50" meant on that form, although she testified she was generally knowledgeable about Plaintiff's forms and credit policy.

7. At a different point, Holly testified that information as to whether a person is employed

or not would not appear on the pre-solicitation form but might be available from the Credit Bureau.

8. Holly did not testify as to whether the FICO score would tell Plaintiff how often (or for how long) Defendant had ever used credit.

the period from January 1996 through December 1996. The documents Plaintiff submitted at trial indicate that Defendant apparently used the card through July 1996, without a problem. For example, he used it for five transactions totaling $110.19 from January 31 through February 16, 1996. He timely paid that bill in full on March 4, 1996. On February 23, 1996, he used the card for one $77.58 transaction. Trial Exhibit 2 does not include Plaintiff's records for the period March 26, 1996, through July 25, 1996. Defendant's statement for the period July 26, 1996, through August 25, 1996, reflects a zero "previous balance" (which means that Defendant paid the earlier $77.58 charge), but Trial Exhibit 2 is silent as to when that payment was paid or whether other charges were incurred or payments were made in the intervening period.

The statement for the period July 26, 1996 through August 25, 1996, reveals charges for purchases and cash advances totaling $9,000, plus finance charges of $105.32. Those charges and finance charges placed Defendant $1,175.84 over his credit limit, according to this statement.

### D. Defendant's Payments to AT & T

Defendant made a payment of $68.84 on his account on September 11, 1996, and another payment of $224.16 on October 7, 1996. Trial Exhibit 2. He made no further payments on the account.

Defendant filed his Petition and Schedules under Chapter 7 of the Bankruptcy Code on January 14, 1997, about five months after the August charges were made. His Petition reflects that he was represented at that time by Peter D. Manning, Esq., a San Jose attorney.

### E. Defendant's Use of Other Credit Cards

Defendant also used three other credit cards during 1996. He used each of them responsibly during the first few months of 1996, making modest charges and expenses, until July 1996. For example, his NationsBank statement, with a March 17, 1996 closing date, showed a zero "previous balance" and charges of $162.33. Trial Exhibit 6. He timely paid the $162.33 in full on March 26, 1996, and made additional charges in March and early April totaling $111.52. In July 1996, he charged $1,730 on that card for some purpose in Ho Chi Minh City, Vietnam, and made a $130 payment on the card on July 29, 1996.[9] In August 1996, he took a series of cash advances on that card totaling $8,500, bringing his balance to $10,843.26. Trial Exhibit 7.

His Shell Oil credit card statements showed modest charges and regular payments from January through July 1996. Then on August 11, 1996, he took a $4,000 cash advance on that card. Trial Exhibit 7.

His First Card statements showed limited activity (small or no charges and regular payments) in the first part of 1996. Then, in August 1996, he took cash advances totaling nearly $9,600 and made payments of $134.97. Trial Exhibit 8.

No evidence was presented by Plaintiff or Defendant of Defendant's use of any specific credit cards before 1996. The record does not reveal, therefore, the extent to which he used credit before that time. One cannot tell whether he used very small amounts of credit (*e.g.*, charging from zero up to a total of $50 or $100) or whether he charged larger amounts. However, as explained later in this Decision, and based on Holly's testimony, Defendant apparently used some credit satisfactorily before January 1996, although he may have used credit very infrequently and the amounts borrowed or charged may have been very small.

---

9. Defendant traveled to Vietnam once, and perhaps twice, in connection with his father's passing. His brother in France paid for at least one trip. Defendant testified that it was extremely important in his culture for him to return to Vietnam at that time.

Consistent with the foregoing explanation of Defendant's use of his four credit cards, Debtor's Bankruptcy Schedule F (Trial Exhibit 1) reflects the following unsecured claims totaling $34,441.58:

| | |
|---|---|
| AT & T Universal Gold MasterCard | $ 9,270.61 |
| First Card | $10,057.23 |
| NationsBank of Delaware | $10,910.28 |
| Shell MasterCard | $ 4,203.46 |

### F.  Defendant's Gambling

Defendant testified that he lost the money that he borrowed on these credit cards through gambling. Defendant's Statement of Financial Affairs (Trial Exhibit 1) reflects that he lost $30,000 during the period December 1995 through December 1996 due to gambling. He explained that he had gambled since he was a small child in Vietnam. He gambled throughout his life, gambling regularly as an adult. Before 1996 he had gambled in Las Vegas and in Reno, Nevada, and at Bay 101 in California. He liked to play the game "21." In the past, he would take small amounts of money, sometimes from credit cards, play and win, and pay back what he had borrowed.

Then, in 1996, he gambled and lost a lot of money. He began to gamble larger amounts of money with both the hope and the expectation of winning and paying the monies back, as he had done before. He explained that he had to gamble large amounts of money so he could pay back the large sum of money he owed. In August 1996, he gambled "big," to recoup his losses. He insisted over and over again that he always intended to repay Plaintiff. He was very emotional at trial, crying intermittently.

Defendant also explained that he tried to find work to pay Plaintiff back. He testified that, after he lost the money he took from his AT & T card, he sought work in gas stations and as a dishwasher in Vietnamese restaurants, but that no one would hire him because he was too old.

### II.  APPLICABLE LAW

#### A.  The Elements of Fraud

Plaintiff requests that the credit card debt owed by Defendant to Plaintiff be declared non-dischargeable in bankruptcy because the extension of credit from Plaintiff to Defendant allegedly was obtained through Defendant's actual fraud. 11 U.S.C. § 523(a)(2)(A) provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—.... (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A)

■ In the Ninth Circuit, to prove actual fraud, a creditor must demonstrate each of the following elements:

(1) The debtor made the representations;

(2) at the time he knew they were false;

(3) he made them with the intention and purpose of deceiving the creditor;

(4) the creditor relied on such representations; and

(5) the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

See Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir.1996) ("Eashai") and cases referenced therein. "The Creditor must prove each element of fraud by a preponderance of evidence." Id., citing Grogan v. Garner, 498 U.S. 279, 290, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("Grogan").

As explained by the Ninth Circuit in Eashai:

Recently, in Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court determined that when Congress used the term "actual fraud" in § 523(a)(2)(A), Congress was

referring to the general common law of torts. [FN3] *Id.* at 71 n. 9, 116 S.Ct. at 443 n. 9. Thus, the Supreme Court's interpretation of the term "actual fraud" reaffirms the Ninth Circuit's practice of using the common law elements of fraud in exception to discharge cases.

*Eashai,* 87 F.3d at 1086–87.

Fraud cases based upon credit card debts are different from some other types of fraud cases, in that credit card transactions "involve three parties: (1) the debtor/card holder; (2) the creditor/card issuer; and (3) the merchant who honors the credit card." *Id.* at 1087. The difficulty in credit card cases is for the creditor/card issuer "to prove the elements of misrepresentation and reliance", even though the issuer does not normally deal face to face with the debtor—at least at the time the credit card purchases at issue are made. *Id.*

In *Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280 (9th Cir. 1996) ("*Anastas* "), the Ninth Circuit clarified that in applying the common law elements of fraud to the situation of credit card debt, the Court must make three essential inquiries:

(1) Did the card holder fraudulently fail to disclose his intent not to repay the credit card debt;

(2) did the card issuer justifiably rely on a representation by the debtor; and

(3) was the debt sought to be discharged proximately caused by the first two elements?

*Anastas,* 94 F.3d at 1283, *citing Eashai,* 87 F.3d at 1088.

With regard to the first issue, *i.e.,* whether the debtor fraudulently failed to disclose his intent not to repay the credit card debt, the Ninth Circuit, in *Eashai,* analyzed three different legal theories, rejected two of them, and adopted the third. 87 F.3d at 1087–88.

The Court of Appeals rejected the majority "implied representation" approach, according to which a credit card holder impliedly represents upon using the credit card that he has the ability and intention to pay for the goods or services. *Id.* at 1088. The Ninth Circuit also rejected the "assumption of the risk" theory, according to which a card holder makes a false representation to the issuer only when the card holder continues to use the card *after* the card has been revoked and that revocation has been communicated to him. *Id.* Under that theory, only those charges made after the cardholder has been notified that his/her card has been revoked are non-dischargeable under § 523(a)(2)(A). *Id.*

The Ninth Circuit adopted the third approach, sometimes referred to as the "totality of the circumstances" theory. *Eashai* at 1087. That theory was established in *In re Faulk,* 69 B.R. 743, 757 (Bankr.N.D.Ind.1986) and adopted by the Ninth Circuit Bankruptcy Appellate Panel in *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988). *Id.* Under this theory, the trial court may consider twelve non-exclusive factors (referred to as the "*Dougherty* factors") in determining the debtor's intent, *i.e.,* whether or not the debt was incurred through actual fraud (where the debtor made the charges with no intention of paying for the goods or services). *Id.* at 1087–88.

The Ninth Circuit emphasized in *Eashai* that the *Dougherty* factors go to the issue of whether or not there was an intent on the part of the debtor to deceive, and that the creditor must *also* prove the other elements of common law fraud, including a false representation, justifiable reliance, and damages.

We incorporate the twelve factors of *Dougherty* into an approach which gives consideration to all of the elements of common law fraud. We adopt the twelve factors of *Dougherty* to establish the element of intent to deceive. However, a creditor in a credit card kiting case must also prove the other elements of common law fraud, including a false

representation, justifiable reliance, and damages.

*Eashai*, 87 F.3d at 1088.

The Ninth Circuit then reiterated in *Anastas* that the finder of fact may refer to the *Dougherty* factors "in determining whether there was a lack of intent to repay", *Anastas*, 94 F.3d at 1284, but that the additional elements of fraud normally required in § 523(A)(2)(a) cases also apply in the case of credit card debt. *Id.* at 1286, citing *Eashai*, 87 F.3d at 1088.

### B. The Element of Defendant's Fraudulent Intent

■ The twelve non-exclusive *Dougherty* factors, which are used to analyze the debtor's intent, are as follows:

1. The length of time between the charges made and the filing of bankruptcy;
2. whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3. the number of charges made;
4. the amount of the charges;
5. the financial condition of the debtor at the time the charges were made;
6. whether the charges were above the credit limit of the account;
7. whether the debtor made multiple charges on the same day;
8. whether or not the debtor was employed;
9. the debtor's prospects for employment;
10. financial sophistication of the debtor;
11. whether there was a sudden change in the debtor's buying habits; and
12. whether the purchases were made for luxuries or necessities.

*See Eashai*, 87 F.3d at 1087–88.

■ In *Anastas*, 94 F.3d at 1285–86, the Ninth Circuit highlighted the important difference between an *ability* to repay and an *intention* to repay, explaining that the trial court's duty is to decide whether there was an intention to repay.

We emphasize that the representation made by the card holder in a credit card transaction is not that he has an *ability* to repay the debt; it is that he has an *intention* to repay. Indeed, section 523(a)(2) expressly prohibits using a non-written representation of a debtor's financial condition as a basis for fraud.

Thus the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt.

The Court of Appeals explained further as follows:

While we recognize that a view to the debtor's overall financial condition is a necessary part of inferring whether or not the debtor incurred the debt maliciously and in bad faith, and that the twelve factors that were set out in [*In re Eashai*, 87 F.3d 1082 (9th Cir.1996)] are useful for arriving at a finding of bad faith, the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith.

We have previously held that reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit. *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir.1978). However, in applying the concept of reckless disregard for

the truth of a representation in the case of credit card debt, we must be careful to keep in mind that the representation being made by the card holder is solely as to *intent* to repay, not as to the debtor's *ability* to repay. Thus, courts faced with the issues of dischargeability of credit card debt must take care to avoid forming the inquiry under section 523(a)(2)(A) as to whether the debtor recklessly represented his financial condition. The correct inquiry is whether the debtor either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt.

*Anastas,* 94 F.3d at 1286 (emphasis added).

### C. The Element of Justifiable Reliance

■■■■ The correct standard of reliance to be applied in a § 532(a)(2)(A) action is a question of federal law. *See Grogan,* 498 U.S. at 284, 111 S.Ct. 654; *In re Apte,* 180 B.R. 223, 227 (9th Cir. BAP 1995) (*"Apte"*). The Ninth Circuit has held that "justifiable reliance" is the proper standard to be applied in § 523(a)(2)(A) actions. *See In re Kirsh,* 973 F.2d 1454, 1457 (9th Cir.1992) (*"Kirsh"*). In considering whether reliance is justifiable, the Court must consider "the knowledge and relationship of the parties." *Id.* at 1458; *Apte,* 180 B.R. at 229.

With respect to the required element of justifiable reliance, the Ninth Circuit stated in *Anastas:*

> As we explained in *Eashai,* the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable. *Eashai,* 87 F.3d at 1091.

*Anastas,* 94 F.3d at 1286.

### D. The Statutory Presumption of Non–Dischargeability

The Statute provides for a rebuttable presumption of non-dischargeability in cer-

tain circumstances. Section 523(a)(2)(C) provides that:

> for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act.

11 U.S.C. § 523(a)(2)(C). As none of the charges involved in this case were incurred within sixty days of January 14, 1997, the date Defendant filed for bankruptcy protection, the statutory presumptions contained in section 523(a)(2)(C) are inapplicable.

### E. Recovery of Defendant's Attorney Fees

■■■■ The Code also provides that a Debtor may recover reasonable attorneys fees incurred in defending certain nondischargeability actions. Section 523(d) provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, ex-

cept that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

## III. ANALYSIS

### A. Defendant's Intent to Repay

Plaintiff has not met its burden of proof with respect to the elements of the claim for relief alleged: Plaintiff has not demonstrated that, when Defendant used his AT & T card in August 1996, he did not intend to repay the sums he borrowed. Plaintiff has also failed to prove that it justifiably relied upon a representation by Defendant.

### 1. The Dougherty Factors

The first issue before the Court is whether Defendant intended to pay the AT & T charges back when he incurred them. In this regard, the Court's analysis of the Dougherty factors is as follows.

The charges at issue in this case were made in August 1996, about five months prior to the date Defendant filed for bankruptcy. Thus, Plaintiff does not have the benefit of a statutory presumption of non-dischargeability. Because five months is a relatively long time, this factor favors the Defendant or is neutral. It does not assist the Plaintiff in its attempt to show that Defendant incurred the charges at issue here with no intention of paying them back.

The record is unclear as to whether Defendant consulted an attorney prior to August 1996, when the charges at issue were made. Defendant explained that he did talk to a secretary, named Miss Romie, who apparently worked for an attorney, but testified that he never met, or even spoke with the attorney for whom she worked. No evidence was presented as to the date Defendant spoke with Miss Romie or whether they spoke before or after August 1996. Defendant's Statement of Financial Affairs, Form 7, states that De-fendant paid Geoffrey Rawlings, Esq. the sum of $550 for advice regarding debt counseling or bankruptcy within a year of filing his Petition, but the record is silent as to when Defendant spoke with him (and whether they spoke before or after August 1996). It is possible that Ms. Romie may have worked for Mr. Rawlings, in which case Defendant may never have met Mr. Rawlings personally.

Peter D. Manning, Esq., a San Jose attorney, represented Defendant in filing his Bankruptcy Petition in January 1997, but there was no evidence that Defendant consulted with him prior to August 1996. This factor does not assist the Plaintiff as the record is incomplete.

Defendant made four charges for purchases and took twelve cash advances from his AT & T card in August 1996, for a total of $9,070.32. These two factors (the number and amount of the charges) favor Plaintiff.

Defendant's financial condition when the charges were made was extremely limited given his very low income, as explained above. This factor favors Plaintiff on the issue of Defendant's intent (but, as explained below, goes against Plaintiff on the issue of justifiable reliance).

Defendant exceeded his credit limit on the AT & T card in August 1996 by about $1,175.84.[10] The Court notes, in this connection, that plaintiff voluntarily *chose* to allow Defendant to exceed his credit limit, as conceded by Holly. Plaintiff did not allege, or prove, that Defendant engaged in a "kiting" or similar scheme in order to defraud Plaintiff into allowing him to exceed his limit. This factor is neutral or favors Plaintiff somewhat.

Defendant took cash advances of $7,000 on August 13, 1996 and $200 on August 14, 1996, two cash advances of $200 on August 15, 1996 and $200 on August 16, 1996, $100 on August 17, 1996, $200 on August 18,

---

**10.** If one were to "back out" the "finance charges" and "cash advance fees," the amount by which he exceeded his credit limit would be reduced by about $170.

1996, two cash advances of $200 each on August 20, 1996 and August 21, 1996, and a cash advance of $100 on August 22, 1996. This factor of multiple cash advances in a short period of time, along with the Defendant's general use of the card during August 1996, favors Plaintiff.

Debtor was unemployed when he used the card in August 1996. This factor favors Plaintiff on the issue of Debtor's intent.

Debtor sought employment to repay his debt to Plaintiff, but was unable to find work because of his age. The fact that Defendant sought employment in order to repay Plaintiff weighs in his favor. Although he thought he could find some kind of work, Defendant's objective prospects for significant employment were not good. Also, his chances of repaying all four credit card companies, from which he took cash advances of over $30,000, through work as a dishwasher or helper in a gas station, were very poor.

The record was not clear as to the level of Defendant's financial sophistication. He was not questioned about his education, his employment history, his ownership of property, and/or his business experience in the past. His income (since at least 1996) and life style (sharing a rented room with another person) did not provide much opportunity for learning about financial matters. The Court finds that he was below average in financial sophistication. This factor favors Defendant.

There was a sudden change in Defendant's use of credit. He took cash advances totaling over $30,000 from his various credit cards in August 1996, including the sums taken from his AT & T card. This factor favors Plaintiff.

Defendant used the money obtained from the cash advances primarily for gambling. Gambling is certainly not a necessity (although it can be an addiction), but it was Defendant's method of trying to pay back sums that he had borrowed and lost at gambling.

The Court found credible and plausible Defendant's testimony that he had used the cash advances from his AT & T card for gambling and had lost the money. This was consistent with Defendant's testimony about his lifelong history of gambling.

Plaintiff's counsel questioned Defendant about whether Defendant had really gambled the money he had obtained from advances on his credit cards in August 1996, or had used it for some other purpose. Plaintiff's counsel also argued to the Court that Defendant might have "drawn down" his credit cards and secreted the money away in Vietnam or in the United States. While that scenario is conceivable, Plaintiff provided no evidence in support of it. Based on the record before the Court, it is certainly more likely that Defendant gambled and lost, as he testified, than that he is holding tens of thousands of dollars somewhere. Plaintiff did not show that Defendant was living at a level above his income. Defendant was still sharing one room in a house as of the trial date. Plaintiff did not demonstrate that Defendant had, or had transferred, any significant assets or that he had used credit card advances from his AT & T card or any other card for a purpose other than gambling. In this regard, Plaintiff could have sought and obtained bank statements and other financial records from Defendant in discovery. It did not. Plaintiff did endeavor to depose Defendant, but did not file a motion to compel when Defendant's counsel advised Plaintiff's counsel, in advance of the deposition, that Defendant would not appear at his scheduled deposition. Defendant testified at trial that he did not appear at his scheduled deposition because of a pre-existing dental appointment. Plaintiff's counsel apparently tried unsuccessfully to reschedule the deposition. Plaintiff did not seek the Court's assistance—either to order a deposition or to continue the trial pending completion of discovery.

Plaintiff's counsel also attempted to show that Defendant did not have a history of borrowing for gambling purposes and then paying monies back. In this connection, counsel for Plaintiff pointed out that the credit card statements in evidence before the Court did not show cash advances prior to July or August, 1996.[11] However, Plaintiff only introduced statements for 1996, and those were incomplete. As noted above, no statements were introduced for the years prior to 1996. No other financial records of Defendant such as bank statements, records of loans, etc. were introduced.

### 2. Defendant Intended to Repay AT & T

Defendant insisted over and over again at trial that he intended to pay back the advances he took from his AT & T card. The Court accepts Defendant's testimony that he intended to win back the monies he had borrowed from his AT & T card to be able to repay Plaintiff. Defendant's efforts to find a job in order to pay Plaintiff support his position that he did not incur the AT & T charges with the intention of discharging them in bankruptcy.

Defendant's payments on the AT & T card—$68.84 in September and $224.16 in October, 1996—also support his position that he used his AT & T card with the intention of repaying Plaintiff. Defendant testified that he filed bankruptcy because he realized that could not pay back his credit card debt. He owed too much to be able to repay it. That was certainly a realistic assessment of his financial situation.

The Court finds that when Defendant incurred the charges at issue in this case, he intended and wanted to repay his debt to Plaintiff. He believed his luck would change and that he would win at gambling and repay Plaintiff, but he did not win. As with the defendant in *Anas-*

*tas*, Defendant had a "serious gambling problem." *Anastas*, 94 F.3d at 1287. And, "although it may have been unlikely that [Defendant] would win back the money to be able to pay back the cash advances that financed the gambling," *Id.*, Defendant had a good faith intention to do so. The record does not support a finding of "the type of malicious and bad faith intent not to repay that is necessary for a finding of actual fraud under Section 523(a)(2)(A)." *Id.*

### B. Justifiable Reliance

Since the Court has found that Defendant did not defraud the Plaintiff, the Court need not reach the issue of justifiable reliance. However, as an alternative holding, the Court rules that Plaintiff did not justifiably rely upon a promise by Defendant to repay the $9,419.72 at issue here. Thus, even assuming *arguendo* that Defendant did not intend to repay Plaintiff, the Plaintiff would not prevail in this lawsuit because Plaintiff did not justifiably rely upon Defendant's promise to repay the Plaintiff. Indeed, Plaintiff's position on this issue is extremely weak.

In deciding whether Plaintiff's reliance was justifiable, the Court must examine "the knowledge and relationship of the parties." *Kirsh*, 973 F.2d at 1458; *Apte*, 180 B.R. at 229. Plaintiff is a multimillion (or multi billion) dollar company that is in the business of providing credit. Defendant is an unemployed man in his mid seventies, with no assets, who speaks English with difficulty, who shares a room as his residence, and has a total income of $640 per month.

It is also important to note that in this case, unlike the situation in *Eashai* and certain other cases, Debtor did not engage in a kiting or similar scheme in an effort to fool the Plaintiff into lending him more money, or giving him more credit, than

---

**11.** The record was not clear as to the purpose of the charges incurred in July 1996 in Viet- nam.

Plaintiff otherwise would have done. *See, e.g., Eashai,* 87 F.3d at 1090 ("Thus, by kiting, the debtor induces the creditor to refrain from action in reliance on the appearance of the debtor's intent to repay").

▮ Creditor has not demonstrated justifiable reliance upon Debtor's promise, implicit in the use of his AT & T card, to repay over $8,000. Defendant's income, known to Plaintiff before Plaintiff sent him an AT & T card, was only $640 per month. The finance charge rate (referred to as "Effective Annual Percentage Rate" on Plaintiff's statements to Defendant) was 15.50 percent. Trial Exhibit 3 at pages 4 and 5. The statement for the period 8/26/96 through 9/25/96 reflects a "New Balance" of $9,227.46, finance charges for that month alone of $120.46, and a "Minimum Payment" of $1,545.62. It is unreasonable to expect that someone with a total monthly income of $640 could possibly make these payments. Plaintiff could not justifiably rely on Defendant's ability to repay $8,000 or $9,000 at 15.50 percent interest from a monthly income of $640.

Although Plaintiff apparently knew Defendant was unemployed before it provided Defendant with a credit card, the Court does not rely upon this fact in reaching its decision. Even if Defendant's $640 monthly income was derived from earnings, he could not have repaid Plaintiff $8,000 or more.[12]

Plaintiff's income should have raised major "red flags" that made reliance by Plaintiff unjustifiable. *Anastas,* 94 F.3d at 1286.[13] Instead plaintiff chose to provide Defendant with an $8,000 line of credit—which was more than Defendant's entire gross *yearly* income. Defendant could not afford the minimum payment on that sum. Additionally, Plaintiff then made the decision to allow Defendant to exceed that limit by $1,175.84.[14]

Plaintiff has not shown that Defendant had a history, prior to January 1996, of borrowing and repaying any sums approaching $8,000 or $9,000. The record is silent as to the *amount* of credit Defendant used prior to 1996, or the frequency, or period of time, during which Defendant ever used credit. Holly's testimony about Defendant's FICO score does not demonstrate justifiable reliance on Plaintiff's part for either a credit line of $8,000, or for allowing Defendant to exceed that limit by $1,175.84, because of the limitations of the FICO methodology to which Holly testified.

There is no evidence on the record before this Court that Plaintiff had any reason to believe that Defendant had any assets or any real prospect for paying back the money Plaintiff lent to him. Thus, Plaintiff chose to offer an amount of credit to Defendant that Plaintiff knew, or certainly should have known, that Defendant could not repay.

12. The record is not clear whether Plaintiff knew Defendant's age; such information might have been available to Plaintiff from the Credit Bureau.

13. The Court is not relying at all on the line of cases discussed earlier that hold that a creditor assumes the risk that every credit card holder will repay the amounts charged unless the cardholder uses the card after the card has been revoked and that revocation has been communicated to him. The Court is deciding this case on its facts. Defendant's application should have raised huge "red flags" for Plaintiff. Here, Plaintiff could not justifiably rely on any implied promise by Defendant to repay over $8,000 at 15.50 percent interest on a monthly income of $640.

14. Plaintiff allowed Defendant to exceed his credit card limit on the AT & T card during the period August 18—22, 1996. However, by August 17, 1996, Defendant already had substantial balances on his other credit cards (including $9,172 on his First Card, over $4,000 on his Shell Card, and over $2,000 on his NationsBank card). The information about the balances on Defendant's other credit cards was almost certainly available to Plaintiff from the Credit Bureau *before* Plaintiff decided to permit Defendant to exceed his credit limit. The Court notes, but does not rely upon, Plaintiff's access to this information in reaching its decision herein.

The Court also notes, but does not rely on the fact that Plaintiff knew, before offering Defendant credit, that Defendant possessed other credit cards; Plaintiff knew, or could have known, from the Credit Bureau what the credit limits were on those cards. When Plaintiff decided to offer $8,000 in credit to Defendant, he already had a $10,700 line of credit on his NationsBank card (Trial Exhibit 6), a $4,700 credit line on his Shell card (Trial Exhibit 7), and a $10,000 credit line on his First Card (Trial Exhibit 8). Thus, Plaintiff gave Defendant an AT & T card with an $8,000 line of credit, knowing that he would then have a total of about $32,400 in credit on his four credit cards, although his monthly income was only $640 per month.

Stated differently, four of Defendant's creditors (including Plaintiff), which are among the most important lending institutions in the country, lent a total of over $32,400 to an unemployed man in his mid-seventies, for whom English was not a first language, with an income of $640 per month.

## C. Defendant's Reasonable Attorney Fees

The issue remaining before the Court is whether Plaintiff should be required to pay Defendant's reasonable attorney's fees under Bankruptcy Code Section 523(d).

■■■■ The award of reasonable attorney's fees under 11 U.S.C. § 523(d) is within the Bankruptcy Court's sound discretion. *See Vasseli v. Wells Fargo Bank, N.A.(In re Vasseli)*, 5 F.3d 351, 352 (9th Cir.1993); *In re Stahl*, 222 B.R. 497, 504 (Bankr.W.D.N.C.1998) (*"Stahl"*); *In re Williams*, 217 B.R. 387, 388 (Bankr. D.Conn.1998) (*"Williams"*). The Court need not find that the Plaintiff acted in bad faith or acted frivolously before fees and costs may be awarded. *Stahl*, 222 B.R. at 505; *Williams*, 217 B.R. at 388. The court must only make the determination that the plaintiff proceeded past a point where it knew, or should have known, that it could not carry its burden of

proof. *See Williams*, 217 B.R. at 389, citing *American Savings Bank v. Harvey (In re Harvey)*, 172 B.R. 314, 318–19 (9th Cir. BAP 1994). "Substantially justified" has been interpreted to require that the plaintiff-creditor had a reasonable basis both in fact and in law to bring and pursue its non-dischargeability action. *Stahl*, 222 B.R. at 505; *Williams*, 217 B.R. at 388.

■■■ The strongest support for allowance of attorney's fees to Defendant in this case comes from Defendant's very limited income of $640 per month—a fact known to Plaintiff before providing Defendant with a credit card. Plaintiff knew Defendant's income from Defendant's credit application before Plaintiff issued the card. Before bringing this action, Plaintiff also had access to Defendant's schedules which were consistent with Defendant's credit application form (to the Plaintiff) as to Defendant's $640 per month income. Based on that income, Plaintiff should have known that it could not demonstrate the essential element of justifiable reliance. Both when Plaintiff issued a credit card to Defendant and when Plaintiff filed the instant action, Plaintiff had no evidence or reason to believe that Defendant had the ability to repay $8,000 or $9,000 *from a source other than* his income. Plaintiff's position in this case—especially on the justifiable reliance issue—was not substantially justified. Indeed, it is preposterous for an experienced lender, such as Plaintiff, to assume that a person in Defendant's position could repay over $8,000 at 15.50 percent interest.

In *AT & T Universal Card Services Corp. v. Duplante (In re Duplante)*, 215 B.R. 444, 450 (9th Cir. BAP 1997) (*"Duplante"*), the BAP stated that the Ninth Circuit standard for finding substantial justification *on the issue of intent* as: "[a] creditor reviewing the credit card statements and Debtor's schedules and financial statements would have been justified in believing, at least initially, that it could prevail in a Dougherty analysis." The

BAP analyzed the adversary process on a continuum, looking for any point (between filing of the complaint through judgment) that the plaintiff was not substantially justified in pursuing or continuing the litigation. *Duplante*, 215 B.R. at 450.

As discussed above at pages 83–85, the *Dougherty* factors go to the issue of whether or not there was an intent on the part of the debtor to deceive. However, in order to prevail in a § 523(a)(2)(A) action, the creditor must *also* prove the other elements of common law fraud, including a false representation, justifiable reliance, and damages. *Eashai*, 87 F.3d at 1088; *Anastas*, 94 F.3d at 1284. In the instant case, Plaintiff was alerted by the "red flags" in Defendant's credit application that Plaintiff could not justifiably rely on Defendant's ability to repay $8,000 or more at 15.50 percent interest. Plaintiff had no reason to believe that its reliance was justified—from the time prior to filing its complaint through the trial. Plaintiff knew, or certainly should have known, that Defendant could not repay $8,000, much less the $9,419.72 for which Plaintiff sued Defendant. The Court therefore "concludes that a reasonable creditor in the plaintiff's shoes would not have litigated with the debtor and that the plaintiff was not substantially justified in so proceeding." *Williams*, 217 B.R. at 388.

No special circumstances make this award of attorney fees unjust. In this connection, there is no evidence that Plaintiff's representative attended the § 341 Meeting of Creditors held in Defendant's bankruptcy case, which might have provided an opportunity to ask Defendant questions, the answers to which might have convinced Plaintiff not to file the instant action. Plaintiff apparently also filed this lawsuit without seeking an examination of Defendant under Bankruptcy Rule 2004.

Plaintiff also could have sought an extension of the discharge date in order to conduct a 2004 exam of Defendant, but did not. During the litigation, Plaintiff sent Defendant written interrogatories and document requests, to which Defendant responded. Trial Exhibits 5, 9, and E.[15]

Plaintiff noticed Defendant's deposition and sought documents in connection with that deposition. *See* Trial Exhibit 11 noticing Defendant's deposition for October 20, 1997. On October 17, 1997, Defendant's counsel wrote to Plaintiff advising that Defendant was not available on October 20, 1997, and inviting Plaintiff's counsel to call to reschedule the deposition. Trial Exhibit 13. Plaintiff's counsel apparently tried unsuccessfully to reach Defendant's counsel to reschedule it. Trial Exhibit 14. However, Plaintiff did not file a motion to compel Defendant's appearance at a deposition or to continue the trial in order to depose the Defendant.

Duong, Defendant's attorney, submitted a Declaration in Support of Defendant's Request for Attorney's Fees. Duong's charges are $3,760 in attorney's fees, $65.20 in costs and $129.85 in interest charges. Plaintiff, although given every opportunity to do so, did not challenge a single charge, or the total bill. Except for the matter of interest on the unpaid bill, the amounts set forth in the Duong Declaration appear to the Court to be reasonable. Duong charges $150 per hour, which is in the low-to-medium range of fees of bankruptcy practitioners. However, the Court's impression is that Duong has less bankruptcy experience than many bankruptcy practitioners who appear regularly before the Court and is not yet a seasoned trial lawyer.

### D. Interest on Attorney Fees

Duong purports to charge Defendant for "interest" on the unpaid portion(s) of his bill. Defendant, who did not brief the attorney fee issue, offers no support for having to pay his own bankruptcy lawyer *either* pre-petition or post-petition interest *or* for charging Plaintiff for such interest.

---

**15.** Defendant also sought and obtained written discovery from Plaintiff.

There is no evidence before the Court that Defendant has a legal obligation to pay his attorney any interest. No fee contract pursuant to which Defendant agreed to pay interest to his attorney accompanies the request. No other basis for charging interest is asserted. Plaintiff, however, did not challenge Defendant's request for interest for his attorney. Nevertheless, the only factor that suggests to the Court that some interest might be appropriate in this case was the delay caused by Plaintiff's failure to follow this Court's orders by failing to file and serve a timely Response to Defendant's request for attorney fees. However, the Court has decided in this case to exercise its discretion not to award to Defendant, and against the Plaintiff, the interest which Defendant's attorney purports to charge him.

### IV. Conclusion

For the reasons hereinabove set forth, Debtor's $9,175.84 credit card debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Further, Plaintiff was not substantially justified in filing and pursuing the instant action. Accordingly, the Court awards Defendant the sum of $3,825.20 [16] as his reasonable attorney fees and costs in having to defend this action under 11 U.S.C. § 523(d).

Counsel for Defendant shall submit a form of Judgment consistent with this Memorandum Decision after review as to form by counsel for Plaintiff.

---

16. Duong's Declaration dated April 17, 1998 listed attorney fees owing of $3,760.00 and costs of $65.20.