PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____


No. 08-2465 & 08-2466
_____


SANDRA CORTEZ,

Appellant in 08-2465
v.

TRANS UNION, LLC


SANDRA CORTEZ

v.

TRANS UNION, LLC,

Appellant in 08-2466


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 05-cv-5684)
District Judge: Hon. John P. Fullam

Argued: June 11, 2009

Before: McKEE, <u>Chief Judge</u>, HARDIMAN and VAN
ANTWERPEN,
<u>Circuit Judges</u>

(Opinion filed: August 13, 2010)

_____

James A. Francis **(ARGUED)**
John Soumilas
Francis & Mailman, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, Pennsylvania 19110

<u>Counsel for Appellant/Cross-Appellee</u>

Mark E. Kogan
Bruce S. Luckman **(ARGUED)**
Timothy P. Creech
Kogan, Trichion & Wertheimer, P.C.
1818 Market Street, 30th Floor
Philadelphia, Pennsylvania 19103

<u>Counsel for Appellee/Cross-Appellant</u>

_____

OPINION

2

_____

McKEE, Chief Judge.

Sandra Cortez appeals the district court's order remitting a jury's punitive damages award of $750,000 to $100,000 on claims she brought under the Fair Credit Reporting Act ("FCRA"), codified at 15 U.S.C. §§ 1681-1681x.[1] In its cross-appeal, Trans Union, LLC appeals the district court's order denying its motion for judgment as a matter of law and rejecting Trans Union's challenge to the jury's compensatory damages award of $50,000. For the reasons that follow, we will affirm the district court's orders.[2]

---

[1]Additionally, Cortez appeals the district court's order reducing attorney's fees and costs. "We review the reasonableness of an award of attorney's fees for an abuse of discretion." _Rode v. Dellarciprete_, 892 F.2d 1177, 1182 (3d Cir. 1990). Our review of the record does not support the conclusion that the district court abused its discretion in reducing Cortez's attorney's fees and costs. Furthermore, there is nothing in Cortez's limited discussion of attorney's fees and costs to support an abuse of discretion.

[2]Both Trans Union's and Cortez's notice of appeal only directly reference the District Court's Memorandum and

3

Judgment Order (collectively referred to as "May order") entered May 1, 2008. However, in their briefs it is clear that both parties are also appealing the district court's Memorandum and Order and Order (collectively referred to as "September order") entered September 13, 2007.

It is a requirement of Federal Rule of Appellate Procedure 3(c)(1)(b) that a notice of appeal "designate the judgment, order, or part thereof being appealed." "If an appeal is taken only from a specified judgment, the court does not acquire jurisdiction to review other judgments not specified or fairly inferred by the Notice." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010) (quotations omitted) (citing *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1254 (3d Cir. 1977)). We have previously held that because "only a final judgment or order is appealable, the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment." *Elfman*, 567 F.2d at 1253. Additionally, we have held that we exercise appellate jurisdiction over "orders that are not specified in the notice of appeal where: (1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues." *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 144 (3d Cir. 1998).

The district court's September order: (1) denied Trans Union's motion for judgment as a matter of law; (2) denied Trans Union's motion for a new trial as to liability; (3) partially granted Cortez's motion for counsel fees and expenses; and (4) granted Trans Union's motion for a new trial as to damages, unless the Plaintiff accepted a remittitur. On October 12, 2007, Cortez filed a notice of appeal in which she appealed the September order. On February 14, 2008, we dismissed Cortez's appeal for lack of appellate jurisdiction

4

## I.  BACKGROUND

### A.  Factual History

This dispute began when Cortez encountered problems with a credit report that Trans Union sent to a car dealership where she was trying to purchase a car.  It stemmed from a Trans Union product called "OFAC Advisor" that confused Cortez's identity with the identity of someone with a similar name who was on a list compiled by the Treasury Department's

---

because the September order was not a final judgment.  On May 1, 2008, the district court issued a final judgment. The May order specifically referenced the September order and the district court judge stated that the final judgment was entered as a result of Plaintiff's acceptance of the remittitur. The May order entered judgment in favor of Plaintiff and awarded her remitted damages, counsel fees, and costs.

It is clear from this procedural history that the September order is "fairly inferred" by both parties' notice of appeal.  Cortez attempted to appeal the September order, but because it was not a final order, she was unable to do so.  The final judgment of May 1, 2008 cannot be understood without the September order and is clearly a product of that order. Additionally, there is a clear connection between the two orders; the intention to appeal the September order is apparent in both parties' briefs; and neither party has been prejudiced as evidenced by their in-depth briefing of the issues raised in the September order.  Hence, we have appellate jurisdiction over both orders.

Office of Foreign Assets Control ("OFAC").

We will discuss the OFAC List and Trans Union's related product in greater detail below. We note now that OFAC administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against threats to the national security, foreign policy, or economy of the United States. Those sanctions are aimed at specific regimes, individuals thought to be terrorists, international narcotics traffickers, as well as persons involved in activities related to the proliferation of "weapons of mass destruction." http://www.treas.gov/offices/enforcement/ofac/ (visited on June 17, 2010).

OFAC maintains and publishes a list:

[a]s part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs." Their assets

6

are blocked and U.S. persons are generally prohibited from dealing with them.

http://www.treas.gov/offices/enforcement/ofac/faq/answer.shtml#17 (visited on June 17, 2010). The persons and organizations in OFAC's Specially Designated Nationals & Blocked Persons List ("SDN List") are so designated pursuant to a patchwork of federal laws, regulations, and executive orders. *See, e.g.,* 31 C.F.R. §§ 536.101-36.901 (Narcotics Trafficking Sanctions Regulations) & 594.101-94.901 (Global Terrorism Sanctions); Exec. Order No. 13,399, 71 Fed. Reg. 25,059 (April 25, 2006) (Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria).[3] Individuals and businesses in the United States are generally prohibited from conducting any business with anyone named on OFAC's SDN List. *See, e.g.,* 31 C.F.R. § 536.201 ("[N]o property or interests in property of a specially

---

[3] *See also* OFAC Specially Designated Nationals List at 461, http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf (visited on June 17, 2010).

7

designated narcotics trafficker that are in the United States . . . may be transferred, paid, exported, withdrawn or otherwise dealt in.").[4]  Trans Union describes its product, the OFAC Advisor, which is also discussed in greater detail below, as a "screening solution that provides credit grantors with a simple, automatic method for use in complying with new federal regulations as set forth in the USA PATRIOT Act."  J.A. 808.

Sandra Cortez was born in 1944 in Chicago.  She was living in Colorado when, in March of 2005, she decided to buy a new car.  Before visiting a car dealer, she decided to  check her credit report to learn her credit score.  Her score was approximately 760, which is a very good credit rating.  J.A. 80; *see also* J.A. 526-27 (listing Cortez's score as 761 in the credit report obtained by the dealership);[5]

---

[4] S*ee also* OFAC Frequently Asked Questions and Answers, http://www.ustreas.gov/offices/enforcement/ofac/faq/index.sh tml#sdn (then follow "What is an SDN?" hyperlink) (visited on June 17, 2010).

[5] We assume that this is a "FICO" score.  Individuals with FICO scores between 760 and 850 are generally eligible

http://www.myfico.com/myfico/CreditCentral/LoanRates.aspx (visited on June 17, 2010). The credit report that Cortez downloaded before going to the car dealership was compiled and furnished by Trans Union, one of the three major companies providing credit reports in the United States. That report contained no information about OFAC's SDN List and did not suggest that Cortez was a "Specially Designated National" or SDN, nor did it contain any information that would suggest that she was suspected of being associated with anyone who was an SDN.[6]

---

for the most favorable interest rates for loans. The Fair Isaacs Company ("FICO") is in the business of analyzing credit factors electronically for the credit industry in general, including banks and credit card companies. The score that it calculates is intended to be a numerical indicator that correlates with the strength of one's credit history. That score has come to be known as the "FICO" score after the Fair Isaacs Company. *See In re Nguyen*, 235 B.R. 76, 80 (Bankr. N.D. Cal. 1999). Only about 27 percent of the population have scores between 750 and 799. *See* http://www.myfico.com/CreditEducation/CreditScores.aspx (visited on June 17, 2010).

[6] Trans Union later acknowledged that personal credit reports, which it provides to consumers, never show any

Cortez planned to finance her car purchase through the dealership. Armed with knowledge of her strong credit score and a copy of her credit report, Cortez went to John Elway Subaru a car dealership in Colorado, to purchase a car. She arrived at the dealership at approximately 1:00 pm and was ready to proceed with a purchase about thirty minutes later. She began completing the required paper work and furnishing the information required to obtain a car loan through the dealership. The dealership's finance manager, Tyler Sullivan, used the information Cortez provided to obtain Cortez's credit report. J.A. 468. It was a Trans Union credit report because the dealership subscribed to Trans Union's credit reporting services, including the OFAC Advisor. Unlike the credit report Cortez had downloaded before going to the dealership, the Trans Union credit report that the dealership obtained contained what Sullivan later referred to as an "advisor alert," which was an

---

information or alerts from its OFAC Advisor that it provides to creditors. J.A. 205.

10

alert from the OFAC Advisor. J.A. 471.

This was the first time that Sullivan had ever seen such an alert. *Id.* He called the regional finance director to determine how he should respond. J.A. 472-73. He then went to OFAC's SDN List on the Treasury Department's website "to check [Cortez's] name against the actual list." J.A. 473. In searching the list, he first "look[ed] for a matching name" and if there was a match, he planned to check birth dates. J.A. 474.[7]

Sullivan then returned to Cortez and started asking her questions including whether she had "always lived in the United States, if [she] had ever lived outside of the country" and other "really strange questions." J.A. 83. He then showed Cortez the credit report Trans Union had provided to the dealership. When she looked at it, she saw that "it had all of these OFAC Alerts,

---

[7] The credit report Trans Union sends to creditors who subscribe to the OFAC Advisor does not contain any further information about the significance of an OFAC alert, nor does it provide any information about contacting anyone at the Treasury Department who handles OFAC alerts. J.A. 187-89.

talk alerts." *Id*. Cortez was very confused, she explained to Sullivan that she had "never been out of the country and that [she] was born in Chicago." *Id.* Sullivan responded by telling Cortez that "he was going to have to check with the FBI . . . [t]o see if [she] was this person" in the OFAC alert on her credit report. J.A. 84. As this was occurring, Cortez was waiting in the salesperson's office, and the dealership had her car keys. *Id.* Finally, at about 5:00 pm, Cortez said she had to leave, but someone asked her to wait.[8] J.A. 84-85. When she asked what the person was going to do, again she was told that the FBI would be called. At this point, hours had passed and the dealership was holding Cortez's down payment on the car. *Id.*

A short time later, Cortez finally left the dealership. She called the dealership that same evening and was told that they had determined that she "probably" was not the person in the OFAC alert, and that she could pick up the car. J.A. 85. That

---

[8] It is not clear from her testimony who exactly asked Cortez to wait.

12

evening, she did go back to the dealership and she eventually got the car.[9]  Before leaving the dealership with her new car, she asked for a copy of the credit report that the dealership had received from Trans Union.  The dealership provided a copy, and pointed out the OFAC and HAWK alerts on the report.[10]

_____

[9] She later testified that while she was sitting at the dealership, she was "watching people stare at [her] walking back and forth, and it was pretty humiliating.  They all knew what was going on, and [she] was afraid that they thought [she] was this person."  J.A. 86.

[10] Trans Union's website describes *"HAWK alerts"* as follows:

> TransUnion provides creditors with HAWK alert message [sic] to notify them of potentially fraudulent information and advises them to check that information more carefully.

> Special messages such as HAWK alert messages inform creditors that they need to verify specific information. The message is based on the personal information used to access your credit report. It may also be based on the personal information recorded in your credit report. In response to special messages, creditors may request that you verify your personal information you submitted at the time of application.

http://www.transunion.com/corporate/personal/persona

13

That credit report was a two-page document entitled: "TRANSUNION CREDIT REPORT." J.A. 526-27. It contained identifying information about Cortez including her name, Social Security number, birth date, current and former addresses, telephone number, and employer. A number of sections appeared directly below that information in the same font and style. The first such section was labeled: "SPECIAL MESSAGES." That "SPECIAL MESSAGES" section contained the OFAC and HAWK alerts. It was followed by: "MODEL PROFILE," which contained several numbers including Cortez's FICO credit score. The report then contained the following four sections: "CREDIT SUMMARY", "TRADES", "INQUIRIES", and "END OF CREDIT REPORT —

l.page (follow "Consumer Support" hyperlink; then follow "Get answers to your questions" hyperlink under "Related Topics"; then search "Answers" for key words "Hawk alert"; then follow "What is a HAWK alert?" hyperlink) (last visited June 1, 2010). As the above citation shows, getting information other than sales information is cumbersome at best on Trans Union's website.

SERVICED BY." *Id*.

The "SPECIAL MESSAGES" section on the first page stated: "HAWK ALERT: INPUT ISSUED: 1959-60; STATE: CA; (EST. AGE OBTAINED 00+ TO   ) . . . HAWK ALERT: FILE ISSUED: 1959-60; STATE CA; (EST. AGE OBTAINED +14 TO +16)." This was followed by eight entries titled: "OFAC ADVISOR ALERT – INPUT NAME MATCHES NAME ON THE OFAC DATABASE." The information in those eight entries was similar to the information in OFAC's SDN List, including the name: "Cortes Quintero, Sandra." J.A. 526-27.

That report is not visually the same as the report Trans Union provides to consumers. It also does not have the same exact content. The report that was sent to the dealership contained no additional information about the significance of the OFAC alerts and no information about how to follow up or contact anyone regarding any OFAC alerts that may appear. J.A. 187-89.

15

In the aftermath of her visit to the car dealership, Cortez contacted Trans Union a total of four times in an effort to correct her credit report. J.A. 199. She first telephoned Trans Union on March 31, 2005, soon after she purchased the car. J.A. 93. On that day, she spoke with Trans Union's customer service representatives who told Cortez that there were no OFAC alerts on her credit report. J.A. 207. Cortez responded by faxing a copy of the report she had obtained from the dealership along with a letter that summarized her experience there. J.A. 93. In that letter, she told the customer service representative that she had spent a total of six and a half hours in the dealership, that she was told the FBI would have to be contacted, and that she was asked not to leave while the dealership looked into the issue. J.A. 94-95; J.A. 533.

On April 6, 2005, not having received any response to her letter, Cortez sent another letter to Trans Union. J.A. 96; J.A. 219; J.A. 534. In that letter, she again explained that there were

16

"several terrorist alerts" on her credit report and she asked for "a response from [the] company regarding these alerts." J.A. 96-97. Cortez received a generic written response to that letter. The letter she received was dated April 18, 2005, and was unsigned. It stated:

> After reviewing your correspondence, we were unable to determine the nature of your request. To investigate information contained in your credit report, please list the account name and number, and specify why you are disputing it (for example, "this is not my account", "I have never paid late", "I have paid this account in full", etc.). Unless you provide us this information, your request will be considered frivolous under the federal Fair Credit Reporting Act, and we will be unable to initiate an investigation.

J.A. 537. By letter dated April 24, 2005, Cortez responded to Trans Union's April 18, 2005 letter. J.A. 99. She included copies of her prior correspondence and explained, "[w]ith this letter, this makes my fourth request to have this incorrect information removed from my credit report. If you look at the credit report enclosed you will notice 10 Hawk and OFAC Advisor alerts. . . . I am disputing these alerts because they do

17

not belong to me. The name is different, the birthdate is different and I do not have a passport. I want these alerts removed from my account." J.A. 539. Cortez also notified Trans Union a second time that it had the wrong employer listed for her. *Id.* Cortez received a response from Trans Union dated May 10, 2005. Under the heading "Re: Dispute Status - No Hawk Alerts or OFAC Advisor Alerts," the letter stated, "[b]ased on the information provided to TransUnion, our records show that the information you disputed does not currently appear on your TransUnion credit report." J.A. 545.[11] Based on this letter, Cortez believed that Trans Union had removed the HAWK and OFAC alerts from her credit report. J.A. 102.

On June 3, 2005, Cortez returned to the dealership and asked for another credit report in order to confirm that the alerts had in fact been removed. Despite Trans Union's representation

---

[11] Trans Union acknowledged that this was a form letter. J.A. 212.

18

to the contrary, the credit report the dealership furnished to Cortez still had OFAC alerts. J.A. 103. There were, however, some changes from the report that had initially been sent to the dealership the day Cortez went to buy a car. The June 3, 2005 report no longer had the phrase: "HAWK ALERT." Instead, the report now stated: "HIGH RISK FRAUD ALERT: CLEAR FOR ALL SEARCHES PERFORMED." J.A. 546. It still stated: "OFAC NAME SCREEN ALERT - INPUT NAME MATCHES NAME ON THE OFAC DATABASE." *Id*. It then had four entries with information from OFAC's SDN List (as opposed to eight in the original credit report furnished by the dealership).

Cortez next went online to the Treasury Department website to determine whether her name actually appeared on OFAC's SDN List. She discovered a similar name and emailed the Treasury Department to ask how she might correct the error and remedy her situation. J.A. 104-05. The Treasury Department referred her to information on its website, which she

19

later testified stated the following:

> If credit bureaus choose to place OFAC information on their credit reports [sic] they should consider the following guidelines. The text on the report should explain that the individual's information is similar to the information of an individual on OFAC's SDN list. It should <u>not</u> state . . . that the information matches, or that the credit applicant is, in fact, the individual on the SDN list unless the credit bureau has already verified that the person is indeed on the SDN [list].

J.A. 106-07.

In June of 2006, a landlord pulled Cortez's Trans Union credit report when she tried to rent an apartment. Cortez told him about the OFAC alerts before he reviewed the credit report, in an effort to explain and minimize their effect. That credit report, dated June 12, 2006, was substantially similar to the second report Cortez had received from the dealership more than a year earlier. J.A. 549-51. Although it did not contain any "HAWK ALERT" messages, it still stated, "OFAC NAME SCREEN ALERT – INPUT NAME MATCHES NAME ON THE OFAC DATABASE". *Id.* It also still had four entries

20

with information from OFAC's SDN List.  Nevertheless, Cortez was able to rent the apartment.  J.A. 112.

From the first day in Elway Subaru, when Cortez learned about the OFAC alerts on her credit report, Cortez spoke with her daughter, Anna Marie Schen, about her ordeal.  J.A. 141. The OFAC alerts came up at least once during every communication between Cortez and Schen after the incident at Elway Subaru, and subsequent trial testimony established that the alerts often reduced Cortez to tears.  The alerts also caused Cortez to lose weight and they interfered with her ability to sleep to such an extent that she resorted to medication.  J.A. 142. According to Schen, the credit report issue "is the number one stressor in [Cortez's] life. . . . [T]his is a big stressor over the past two years."  J.A. 143-44.  It has been "very . . . devastating."  J.A. 146.

## B.  The Significance of OFAC Alerts and the SDN List

The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism

Act of 2001, better known as the USA PATRIOT Act, further codified the obligations of financial institutions in their dealings with individuals on OFAC's SDN List. 115 Stat. 272 (Oct. 26, 2001). Under the USA PATRIOT Act, the Treasury Department must "require financial institutions to implement . . . reasonable procedures for . . . consulting lists of known or suspected terrorists or terrorist organizations provided to the financial institution by any government agency to determine whether a person seeking to open an account appears on any such list." 31 U.S.C. § 5318(*l*)(2); *see* 31 C.F.R. § 103.121(b)(4) (The Customer Identification Program "must include procedures for determining whether the customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency."). "[T]ransactions are prohibited . . . if either such transactions are by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof." 31 C.F.R. § 500.201. In most cases, it is unlawful to extend credit to a person whose name is on OFAC's

SDN List. [2][1]

Depending on the applicable law, regulation, or executive order involved, failure to comply with these restrictions may result in civil as well as criminal penalties.  Willful violations carry criminal penalties with fines ranging from $50,000[13] to

---

[12] OFAC has procedures to unblock funds in the case of mistaken identity, 31 C.F.R. § 501.806, and to have a name removed from designated lists, 31 C.F.R. § 501.807.

[13] 19 U.S.C. § 3907 (maximum fine for willful violation of laws governing clean diamond trade).

$10,000,000[14]$ as well as imprisonment ranging from $5[15]$, $10[16]$ to

---

[14] 21 U.S.C. § 1906 (maximum fine of $10,000,000 for willful violation of laws governing international narcotics trafficking); *see also* 31 U.S.C. § 5322 (maximum fine of $250,000 for willful violation of the USA PATRIOT Act, including 31 U.S.C. § 5318(l)(2), which requires financial institutions to consult suspected terrorist lists such as OFAC's SDN List before transacting with individuals, with the amount increasing to $500,000 for aggravating circumstances); 50 U.S.C. § 1705(c) (maximum fine of $1,000,000 for willful violation of the International Emergency Economic Powers Act and its implementing regulations, which include regulations governing many OFAC programs, *see, e.g.,* 31 C.F.R. § 536.701 (penalties under Narcotics Trafficking Sanctions)); 50 App. U.S.C. § 16(a) (maximum fine of $1,000,000 for willful violations of the Trading with the Enemy Act of 1917).

[15] 31 U.S.C. § 5322 (maximum imprisonment term of 5 years for willful violation of the USA PATRIOT Act, including 31 U.S.C. § 5318(l)(2), which requires financial institutions to consult suspected terrorist lists such as OFAC's SDN List before transacting with individuals with term increasing to 10 years for aggravating circumstances).

[16] 18 U.S.C. § 2332d (maximum imprisonment term of 10 years for engaging in financial transactions with a country supporting international terrorism); 21 U.S.C. § 1906 (maximum imprisonment of 10 years for willful violation of laws governing international narcotics trafficking); 50 App. U.S.C. § 16(a) (maximum imprisonment of 10 years for willful violations of the Trading with the Enemy Act of 1917); 50 U.S.C. § 1705(c) (maximum imprisonment term of 20 years for willful violation of the International Emergency

30[17] years, or even life.[18]  Civil penalties range from $10,000 to $1,000,000, or twice the amount of each underlying transaction per violation.[19]

---

Economic Powers Act and its implementing regulations, which include regulations governing many OFAC programs, *see, e.g.,* 31 C.F.R. § 536.701 (penalties under narcotics trafficking sanctions)).

[17] 21 U.S.C. § 1906 (maximum imprisonment term of 30 years for any officer, director, or agent of an entity who knowingly participates in violation of laws governing international narcotics trafficking).

[18] 18 U.S.C. § 2339B (maximum imprisonment term of 15 years for providing material support to a foreign terrorist organization, which term increases to life if the death of any person results).

[19] 19 U.S.C. § 3907 (maximum civil penalty of $10,000 for violation of laws governing clean diamond trade); 31 U.S.C. § 5321 (maximum civil penalty of $100,000 for violation of the USA PATRIOT Act, including 31 U.S.C. § 5318(l)(2), which requires financial institutions to consult suspected terrorist lists such as OFAC's SDN List before transacting with individuals); 50 App. U.S.C. § 16(b) (maximum civil penalty of $50,000 for violations of the Trading with the Enemy Act of 1917); 18 U.S.C. § 2339B (maximum civil penalty of $50,000 or twice the amount of the transaction that is the basis for the violation for providing material support to a foreign terrorist organization); 50 U.S.C. § 1705(b) (maximum civil penalty of $250,000 for violation of the International Emergency Economic Powers Act and its

In a "Q&A" section included on its website, OFAC posts

the following question: "What Is This OFAC Information On

My Credit Report?" It then offers the following reply:

> Credit bureaus and agencies in particular have
> adopted new measures to ensure compliance with
> OFAC regulations. Before issuing a credit report,
> they use special "interdiction" software developed
> by the private sector to determine if a credit
> applicant is on the SDN list. This software
> matches the credit applicant's name and other
> information to the individuals on the SDN list. If
> there is a potential match, the credit bureaus are
> placing a "red flag" or alert on the report. This
> does not necessarily mean that someone is
> illegally using your social security number or that
> you have bad credit. It is merely a reminder to the
> person checking your credit that he or she should
> verify whether you are the individual on the SDN
> list by comparing your information to the OFAC
> information. If you are not the individual on the
> SDN list, the person checking your credit should
> disregard the OFAC alert, and there is no need to
> contact OFAC. However, if the person checking
> your credit believes you are the person on the
> SDN list, then he or she should call the OFAC

---

implementing regulations, which include regulations
governing many OFAC programs, *see, e.g.,* 31 C.F.R. §
536.701 (penalties under Narcotics Trafficking Sanctions));
21 U.S.C. § 1906 (maximum civil penalty of $1,000,000 for
violation of laws governing international narcotics
trafficking).

Hotline to verify and report it.

http://www.treas.gov/offices/enforcement/ofac/faq/answer.sht

ml#consumer1 (visited on June 17, 2010). On that same

website, OFAC also answers the question: "How Can I Get The

OFAC Alert Off My Credit Report?" as follows:

> A consumer has the right under the Fair Credit
> Reporting Act (FCRA), 15 U.S.C. 1681 et seq., to
> request the removal of incorrect information on
> his/her credit report. To accomplish this,
> consumers should contact the credit reporting
> agency or bureau that issued the credit report. For
> more information on consumers' rights under the
> FCRA, visit the Federal Trade Commission's
> w e b s i t e a t
> http://www.ftc.gov/os/statutes/fcrajump.shtm

http://www.treas.gov/offices/enforcement/ofac/faq/answer.sht

ml#consumer2 (visited on June 17, 2010).

### C. Trans Union's OFAC Advisor

OFAC recognizes the need to ensure that its reports do

not mistakenly associate innocent and unsuspecting persons with

persons who are properly labeled "SDN." Thus, OFAC

cautions: "organizations involved in the credit reporting process

27

. . . . can make an important contribution by identifying sanctioned individuals in order to block their ability to use the U.S. financial system and to do business in the United States, but at the same time they should strive to protect consumers from erroneous or misleading information appearing on credit reports." Department of Treasury, *OFAC REGULATIONS FOR THE CREDIT REPORTING INDUSTRY*, Apr. 13, 2004, http://www.treas.gov/offices/enforcement/ofac/regulations/fac cr.pdf (visited June 17, 2010).

In September of 2002, Trans Union announced a "new product for USA Patriot Act Compliance" which it called: "OFAC Advisor." Trans Union lauded the product as a "screening solution that provides credit grantors with a simple, automatic method for use in complying with new federal regulations as set forth in the USA PATRIOT Act." J.A. 808. Trans Union refers to the SDN information that it reports from OFAC as an "OFAC Name Screen Alert." *See, e.g.,* J.A. 549,

570.

The OFAC alert on Trans Union credit reports was developed by a team that included individuals from Trans Union's business and systems units, as well as people from the legal and compliance sections. J.A. 311. In the normal course of developing any such product, a legal and compliance team do preliminary reviews to determine whether the product is "going to require permissible purpose, disclosure, [and/or have] contractual issues." J.A. 312. After the product is developed, another final review is done by a legal team. *Id*.

The information in Trans Union's OFAC alert is provided to purchasers through a third party vendor called "Accuity." J.A. 574, 809. Trans Union decided not to include the underlying information for its OFAC product in Trans Union's own database. That database is called "CRONUS." Trans Union decided to do that because "the only common denominator in all the entries [referring to OFAC's SDN List] was a name." J.A. 313. Unlike CRONUS, the entries in the

SDN List do not always include birth dates, addresses, or Social Security numbers that Trans Union routinely stores and relies on when associating a given consumer with information. *Id.* Having decided to use Accuity rather than maintain the information itself, Trans Union then marketed the OFAC information as part of a separate product called "OFAC Advisor." J.A. 313-14, 808-09.

Trans Union does not sell the OFAC alert information as a stand alone product; creditors must first purchase a Trans Union product such as credit report services and the OFAC alert is added to that product. Purchasers of Trans Union's credit reports who wanted to subscribe to the OFAC Advisor were required to sign an addendum to their agreement with Trans Union in order to subscribe to the OFAC Advisor.[20] Those who

---

[20] That agreement states in relevant part:

TransUnion agrees to make available as an add-on to consumer reports (including as an exclusion criteria on an input prescreen list, or an append to a prescreened list), and as an add-on to certain ancillary products offered by TransUnion from

purchased OFAC Advisor received one credit report from Trans Union with the OFAC information contained in it. However, Trans Union created the report from at least two separate sources: its own CRONUS database and information stored with Accuity. Trans Union requires creditors to provide at least a name and address of a consumer to retrieve information from CRONUS. J.A. 319. However, when retrieving OFAC information, Trans Union sends only a name to Accuity, even

---

> time to time an indicator whether the consumer's name appears on the United States Department of Treasury Office of Foreign Asset Control File ("OFAC File"). The service is referred to as OFAC Advisor. Subscriber may receive the OFAC Advisor service under the following terms: . . . . In the event Subscriber obtains OFAC Advisor services from TransUnion in conjunction with Consumer Report or as an append to an ancillary service, Subscriber shall be solely responsible for taking any action that may be required by federal law as a result of a match to the OFAC File, and shall not deny or otherwise take any adverse action against any consumer based solely on TransUnion's OFAC Advisor Services.

J.A. 568.

though Trans Union may have more information about the person who is the subject of the inquiry. J.A. 318. Trans Union reports a "match" whenever names are "similar." J.A. 180.

Trans Union enters the information it receives from Accuity under the "SPECIAL MESSAGES" section appearing on its credit reports. Trans Union does no other comparison or due diligence with the data it receives from Accuity to attempt to match it to the consumer whose credit report is being furnished. Thus, Trans Union neither compares the OFAC information to other information about a given consumer already in its files, nor does it compare it to any information provided by the creditor/subscriber. J.A. 179. Moreover, once Trans Union receives the OFAC information it does not check or confirm its accuracy; in fact, Trans Union has a policy of never reinvestigating disputes involving OFAC alerts. J.A. 203-04. Trans Union merely "report[s] back that the input information is a match to the OFAC report." J.A. 204.

In a presentation that Trans Union gives to potential

subscribers to the OFAC Advisor, Trans Union states, "The U.S. Treasury Department requires that all institutions comply to insure that they are not extending credit or financial services to customers on the Office of Foreign Assets Control, OFAC list, of known terrorists, drug traffickers, and money launderers." J.A. 155, 570. The presentation represents that Trans Union acts in "partnership" with Accuity and lauds the advantages of this product. J.A. 574. Trans Union describes Accuity as an "[i]ndustry leader in OFAC screening services." *Id.* The slide boasts that the product is "[e]ndorsed" by the American Bankers Association and that it has "[b]roader and more comprehensive file coverage." *Id.* Trans Union also claims its database has "[e]ffective matching logic" that will "[r]educe [the] number of false positives." J.A. 574-75.

As Cortez discovered, the information in the "SPECIAL MESSAGES" section of Trans Union's credit reports is not included in credit reports that Trans Union sends to consumers on request. J.A. 157. The credit reports sent to consumers do

33

have a public records section, which contains information such as tax liens, judgments, or bankruptcies. That information is retrieved from CRONUS. J.A. 214. If Trans Union receives a dispute related to information in the public record section of a report, it investigates the dispute by either checking with its public record vendor or checking court records containing the disputed information. J.A. 199-200. Trans Union does not, however, conduct any investigation in response to disputes related to OFAC alerts. J.A. 201.

It is not clear what Trans Union's customer service representatives tell consumers who dispute OFAC alerts. According to one of Trans Union's group managers who testified at the trial, the company's policy is to refer consumers who complain about an OFAC alert to the Treasury Department. J.A. 205; 211. However, this did not occur in Cortez's case.

According to Trans Union, when the dealership first reviewed Cortez's credit report, Trans Union could not block OFAC information from being included if Accuity determined

that her name matched a name on OFAC's SDN List.  J.A. 182-83.  This continued to be true at least through September of 2006.  However, when this case came to trial, Trans Union had blocked several similar names and any "Sandra Cortez" was blocked from having an OFAC alert on her credit report.  J.A. 183-84.

The Fair Credit Reporting Act will be discussed in detail below.  However, it is helpful at this point to note that the Act affords certain protections to consumers by regulating the disclosure and use of "consumer credit reports" as defined by the Act. Trans Union made an internal determination that the OFAC Advisor was not governed by the FCRA.  According to Trans Union's director of solutions and business development, "[a]fter review by our legal and compliance department they determined that this was not FCRA data."  J.A. 169.

### D.  Procedural History

Cortez brought this action under the Fair Credit Reporting Act after Trans Union failed to correct the problems with her credit report or respond satisfactorily to her inquiries. The suit proceeded to verdict.  The jury found that Trans Union

35

failed to follow reasonable procedures to assure maximum possible accuracy in producing Cortez's credit report and was negligent in doing so. The jury concluded that Trans Union willfully failed to reasonably reinvestigate Cortez's disputes after she informed the company of the erroneous OFAC alert it had included on her credit report. The jury also found that Trans Union willfully failed to note Cortez's dispute on subsequent reports and that it willfully failed to provide Cortez all of the information in her file despite her requests. The jury awarded Cortez $50,000 in actual damages and $750,000 in punitive damages.

Thereafter, Trans Union moved for judgment as a matter of law or in the alternative a new trial or remittitur of the damages awards. The district court denied Trans Union's motion for judgment as a matter of law. The court concluded that the OFAC information was part of Cortez's credit report and thus, governed by the FCRA. *Cortez v. Trans Union, LLC*, Civ. No. 05-5684, 2007 WL 2702945, at **1-2 (E.D. Pa. Sept. 13, 2007). The court also held that there was no basis for granting defendant a new trial, "except with respect to the

alleged excessiveness of the jury's verdict." *Id.* at \*2. The court confirmed the $50,000 compensatory damages award but found that the $750,000 punitive damages award "exceeded permissible limits." *Id*. The district court concluded that "an award of punitive damages . . . [of] double the amount of the compensatory award [was the] maximum which this record would support." *Id.* The court then entered an order which stated in pertinent part: "Defendant's motion for a new trial is GRANTED with respect to damages, unless, within 30 days, plaintiff accepts a remittitur, limiting the award to $50,000 compensatory damages and $100,000 punitive damages, for a total award of $150,000." *Id.* at \*3.

Cortez appealed that order on October 12, 2007. The same day that she filed her notice of appeal, she conditionally accepted the district court's remittitur by appending the following statement: "In the event that the District Court was acting properly within its power and jurisdiction in entering its Order of September 13, 2007, which is a subject of Plaintiff's Notice of Appeal . . . Plaintiff hereby accepts the remittitur." *See* E.D. Pa. Docket No. 71.

We dismissed Cortez's appeal for lack of jurisdiction because the order she appealed was not a final appealable order. Thereafter, Trans Union moved for final judgment. The district court granted judgment to Trans Union "[b]ecause [Cortez] accepted the remittitur." *Cortez v. Trans Union LLC*, Civ. No. 05-5684, 2008 WL 1944160, at *1 (E.D. Pa. May 1, 2008). This appeal and cross-appeal followed. Cortez challenges the remittitur that reduced her punitive damages award, and Trans Union challenges the district court's denial of its motion for judgment as a matter of law, as well as the damages award that the court did approve.

## II. THE FAIR CREDIT REPORTING ACT

"The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). Congress intended to promote efficiency in the nation's banking system and to protect consumer privacy. *TRW Inc. v. Andrews*,

534 U.S. 19, 24 (2001) (citing 15 U.S.C. § 1681(a)). Congress addressed the latter concern by including provisions intended "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517, at 1 (1969). Congress also hoped to address a number of related problems, including "the inability at times of the consumer to know he is being damaged by an adverse credit report," the lack of "access to the information in [his] file," the "difficulty in correcting inaccurate information," and "getting [his] version of a legitimate dispute recorded in . . . [his] credit file."*Id*. at 3 (1969). "These consumer oriented objectives support a liberal construction of the FCRA," and any interpretation of this remedial statute must reflect those objectives. *Guimond*, 45 F.3d at 1333.

In its cross-appeal, Trans Union first argues that its OFAC alert is not covered by the Fair Credit Reporting Act. According to Trans Union, the FCRA does not apply to OFAC information because the "OFAC Screen" is not part of a "consumer report." Trans Union Br. at 18. Inasmuch as that claim goes to the validity of the jury's verdict, we will first

39

discuss Trans Union's cross-appeal.[21]

## A. Reasonable Procedures for Maximum Accuracy, 15 U.S.C. § 1681e(b)

15 U.S.C. § 1681e(b) provides in relevant part: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." As noted, the jury concluded that Trans Union had breached the standard of care required by § 1681e(b). However, Trans Union claims that since the OFAC alert is not covered by § 1681e(b), the district court erred in denying Trans Union's motion for judgment as a matter of law.

15 U.S.C. § 1681a(d)(1) defines a consumer report, in relevant part, as:

> *any* written, oral, or other communication of *any* information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of

---

[21] We review the denial of Trans Union's motion for judgment as a matter of law *de novo*, "viewing the evidence in the light most favorable to the prevailing party." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (quotation omitted).

serving as a factor in establishing the consumer's eligibility for-- (A) credit or insurance to be used primarily for personal, family, or household purposes . . . .[22]

(emphasis added). Trans Union's argument that the OFAC alert somehow manages to avoid the reach of the FCRA ignores the breadth of the language that Congress used in drafting that statute. It is not contested that the credit report that Trans Union sent to Elway Subaru was otherwise subject to the FCRA. Indeed, such reports are precisely what the FCRA was intended to cover. In order to conclude that the OFAC alert is not subject to that remedial statute even though the rest of the report clearly falls within the definition of "consumer report," we would have to conclude that Congress did not mean what it said when it unequivocally defined "consumer report" to include "any . . . communication of any information by a consumer reporting agency."[23] 15 U.S.C. § 1681a(d)(1). Trans Union seeks to avoid this result by arguing that the OFAC alerts were not "used

_____

[22] The statute exempts certain reports or communications that are not relevant here. *See* 15 U.S.C. § 1681a(d)(2).

[23] We use "consumer report" and "credit report" interchangeably. The report referred to as "consumer report" in the statute is more commonly known as a credit report.

or expected to be used . . . in establishing the consumer's eligibility for . . . credit" because, according to its agreement with Elway Subaru, the screen was to be used only for USA PATRIOT Act compliance. *Id.*; *see* J.A. 568.

As noted above, businesses in the United States are generally prohibited from dealing with anyone listed on OFAC's SDN List. *See, e.g.,* 31 C.F.R. § 536.201 ("[N]o property or interests in property of a specially designated narcotics trafficker that are in the United States . . . may be transferred, paid, exported, withdrawn or otherwise dealt in."). Thus, in most cases, it is unlawful to extend credit to a person on OFAC's SDN List.[24]

Trans Union invites us to conclude that information that goes to the very legality of a credit transaction is somehow not "a factor in establishing the consumer's eligibility . . . for credit." 15 U.S.C. § 1681a(d)(1). It is difficult to imagine an inquiry more central to a consumer's "eligibility" for credit than whether federal law prohibits extending credit to that consumer

_____

[24] Recall that OFAC has procedures to unblock funds in the case of mistaken identity, 31 C.F.R. § 501.806, and to have a name removed from designated lists, 31 C.F.R. § 501.807.

in the first instance. The applicability of the FCRA is not negated merely because the creditor/dealership could have used the OFAC Screen to comply with the USA PATRIOT Act, as well as deciding whether it was legal to extend credit to the consumer.

Trans Union also relies on the subscriber addendum to its agreements with creditors to argue that its terms establish that the OFAC alert is not part of credit reports it prepares under the FCRA. Pursuant to that agreement, the creditor or subscriber agrees to be "solely responsible for taking any action that may be required by federal law as a result of a match to the OFAC File, and shall not deny or otherwise take any adverse action against any consumer based solely on TransUnion's OFAC Advisor services." J.A. 568. We are not persuaded that Trans Union's private contractual arrangements with its clients can alter the application of federal law, absent a statutory provision allowing that rather unique result.

As described more fully above, the "SPECIAL MESSAGES" section of Trans Union's credit reports that contain the OFAC alerts is on the first page between the

43

identifying information and the consumer's credit score and in the same formatting as that information. Thus, the OFAC alerts allow the creditor to seamlessly determine a consumer's eligibility for a loan even before looking at the consumer's credit score.

Trans Union also argues that, even if the OFAC alert is covered by the FCRA, the jury's verdict cannot stand because the evidence did not allow a reasonable fact finder to conclude that it was negligent in dealing with Cortez, as required for liability under 15 U.S.C. § 1681e(b). We disagree.

**B. Negligence**

According to Trans Union, its credit report contained the most accurate information possible because Trans Union simply included the information furnished by the government. Hence, it was not reasonable to expect Trans Union to do anything more than it did to insure the accuracy of the information it sold in its credit report. Trans Union argues that it merely informed the dealership that Cortez was a possible match with someone listed on OFAC's SDN List, and it met § 1681e(b)'s requirement of maximum possible accuracy because "match" connotes

44

"possible match" rather than "exact match." Negligent noncompliance with § 1681e(b), consists of the following four elements: "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996).

In rejecting Trans Union's claim and upholding the jury's verdict, the district court correctly concluded that Trans Union's use of the OFAC alert created the impression that Cortez was actually the person named on OFAC's SDN List. While the word "match" may be ambiguous in some circumstances, the jury was entitled to view Trans Union's actions in their proper context. Trans Union provided the credit report with the OFAC alerts to the dealership in response to receiving identifying information about a specific consumer, Cortez. The dealership relied upon the information about Cortez that Trans Union provided to determine whether or not to finance her car

45

purchase. The alert on Cortez's credit report does not state that the names are "similar" to someone on the SDN List or that a match is "possible." It reported a "match" with someone on the SDN List.

Thus, the jury and district court correctly determined that Trans Union could have taken reasonable measures to assure maximum possible accuracy of its credit report with respect to these alerts. "Reasonable procedures are those that a reasonably prudent person would undertake under the circumstances. Judging the reasonableness of a credit reporting agency's procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Philbin*, 101 F.3d at 963 (alterations, quotations, and citations omitted). It is important to note that § 1681e(b) erects a standard of "maximum possible accuracy." That requires more than merely allowing for the possibility of accuracy.

In *Philbin*, the plaintiff's credit report contained a lien that actually belonged to his father. 101 F.3d at 960. He wrote to the credit reporting agency, which corrected the error and

added a notation to the credit report stating, "Do not confuse with father James Philbin Sr different address different social security number." *Id.* Two and a half years later, the plaintiff applied for and was denied credit a number of times. *Id.* at 960-61. The plaintiff then requested his credit report from Trans Union Corp. ("TUC") and TRW Credentials, Inc. *Id.* At 961. The TRW report had no errors. *Id.* When he finally obtained the report from TUC, it still noted the tax lien. *Id.* After filing suit, the plaintiff was again denied credit and learned that the tax lien was still on his credit report, along with other erroneous information. *Id.*

In reversing the district court's grant of summary judgment in favor of TUC on Philbin's § 1681e(b) claim, we held that an unspecified "quantum of evidence" beyond a mere inaccuracy is sufficient for a jury to find negligent failure to assure maximum possible accuracy unless a credit reporting agency convinces the jury otherwise. *Id.* at 965. We also reiterated that inconsistencies between two different reports concerning a single consumer are sufficient to meet this standard. *Id.* at 964, 966. Cortez's evidence is even stronger.

47

Here, the jury could consider evidence of an inconsistency between identifying information provided by Trans Union, for example, Cortez's birth date, and the information on the SDN List. The jury could reasonably conclude that Trans Union could have taken steps to minimize the possibility that it would erroneously place an OFAC alert on a credit report, such as checking the birth date of the consumer against the birth date of the person on the SDN List.

Moreover, the distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic. For example, in *Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986), the Court of Appeals for the Fifth Circuit described that distinction as the difference between reporting that "a person was 'involved' in a credit card scam" and reporting that the consumer "was in fact one of the victims of the scam." *Id.* at 1263. The former statement was undoubtedly true as the consumer had been "involved" in the scam. It was also woefully misleading because it did not inform people that she was involved as a victim of the scam, and not as the perpetrator.

48

Moreover, the reasonableness of a credit reporting agency's procedures is "normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971 (7th Cir. 2004). In *Philbin*, we listed three different approaches that various courts have taken in determining if a plaintiff has introduced sufficient evidence to reach the jury under § 1681e(b). Those approaches are: "that a plaintiff must produce some evidence beyond a mere inaccuracy in order to demonstrate the failure to follow reasonable procedures; that the jury may infer the failure to follow reasonable procedures from the mere fact of an inaccuracy; or that upon demonstrating an inaccuracy, the burden shifts to the defendant to prove that reasonable procedures were followed." *Philbin*, 101 F.3d at 965. We did not have to decide upon any one approach in *Philbin* because the plaintiff had produced evidence sufficient to meet any of the three standards. *Id.* at 966. The same is true here.

Trans Union's own records showed that Cortez was born in May of 1944 and her middle name was "Jean." J.A. 526-527.

49

The person on OFAC's SDN List was named Sandra *Quintero* Corte*s* and was born in June of 1971. *Id.* Within Trans Union's own records there existed a large discrepancy in regard to Cortez's last name, middle name, and even her date of birth. There were other discrepancies as well, including citizenship. Despite those distinctions, the credit report Trans Union sent to the dealership stated: "INPUT NAME MATCHES NAME ON THE OFAC DATABASE." Trans Union included that "warning" even though it had information that should have made it apparent that the OFAC alert had no place in Cortez's credit report.

There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers

and lending institutions involved in credit transactions when it enacted the FCRA.

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party. Thus, Trans Union's argument that it does not control the accuracy of the SDN List is as misleading as the information it provided about Cortez. Trans Union does not know for sure that a consumer has habitually been delinquent in paying his/her credit cards bills, or that s/he does not promptly pay obligations to merchants or taxing authorities. Rather, it collects such information from the primary sources, summarizes it, and reports it to those who will subsequently rely on the resulting reports in making consumer credit decisions. Therefore, the OFAC information is not substantially different from all other information in a credit report, including information taken from public records.

Trans Union remains responsible for the accuracy in its

reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here. *See Philbin*, 101 F.3d at 966; *see also Stewart v. Credit Bureau*, *Inc.*, 734 F.2d 47, 52 (D.C. Cir. 1984) ("Certainly, inconsistencies within a single file or report involving an inaccuracy as fundamental as a falsely reported wage earner plan, as well as inconsistencies between two files or reports involving less fundamental inaccuracies, can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information.").[25]

## C. Trans Union's Liability Under 15 U.S.C. § 1681g

15 U.S.C. § 1681g(a) states in relevant part that "[e]very consumer reporting agency shall, upon request, . . . clearly and accurately disclose to the consumer: (1) *All information* in the

---

[25] *See also Cousin v. Trans Union Corp.*, 246 F.3d 359, 368 (5th Cir. 2001) (when a creditor continues to provide a consumer reporting agency information about a consumer that the agency has determined to be inaccurate, under § 1681e(b) "it is incumbent on the consumer reporting agency to permanently delete and cloak the erroneous information").

consumer's file at the time of the request." (emphasis added). Here, the jury found that Trans Union willfully violated § 1681g, and Trans Union appeals the district court's denial of its motion for judgment as a matter of law on Cortez's § 1681g claim.

Trans Union concedes that Cortez requested her credit report on multiple occasions; nevertheless, it failed to provide her with the HAWK and OFAC alert information on her report. However, Trans Union again makes an argument similar to that discussed above. It argues that the OFAC and HAWK information is not part of the consumer's "file" under the FCRA and that, it was not required to disclose the information to Cortez.

The FCRA defines "file" when used in connection with information on any consumer, as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g). Trans Union attempts to avoid the obvious reach of that language by relying on the fact that the SDN List information was not part of its database; rather, as explained

earlier, that information was separately maintained by Accuity. According to Trans Union, the information should not be considered part of the consumer's file for purposes of the FCRA.[26] Not surprisingly, Trans Union cites no cases to support this argument. The argument requires us to ignore that the FCRA specifically provides that the duty of disclosure applies to "information on [a] consumer . . . regardless of how the information is stored." 15 U.S.C. § 1681a(g). We do not believe that Congress intended to allow credit reporting companies to escape the disclosure requirement in § 1681a(g) by simply contracting with a third party to store and maintain information that would otherwise clearly be part of the consumer's file and is included in a credit report.

Congress clearly intended the protections of the FCRA to apply to all information furnished or that might be furnished in a consumer report.[27] *Gillespie v. Trans Union Corp.*, 482 F.3d

---

[26] Cortez argues that Trans Union failed to make this argument in the district court and that it is therefore waived. However, based upon our review of the record, we believe the argument was adequately presented to the district court.

[27] We express no opinion on whether the term "file" is limited to the information a credit reporting agency includes in the credit report. We note, however, that the term

907, 909 (7th Cir. 2007). Moreover, as the court in *Gillespie* noted, "'file' denotes all information on the consumer that is recorded and retained by a consumer reporting agency that might be furnished, or has been furnished, in a consumer report on that consumer." *Id.* (quoting 16 C.F.R. pt. 600, app. § 603).[28]

In *Gillespie*, the court considered whether a credit reporting agency was obligated to furnish the date of delinquency of a credit account to a consumer who makes a request under § 1681g. Congress sought to prohibit consumers from being hounded by stale information by limiting the amount of time old debts can be reported under the FCRA.[29] Creditors, therefore, have to include a "date of delinquency or purge date" when reporting account information to a credit agency. *Gillespie*, 482 F.3d at 908. The credit reporting agency uses that

"consumer report" is also defined in § 1681a and it is, thus, unlikely that Congress intended the two terms to mean exactly the same thing. *See Nunnally v. Equifax Info. Servs., LLC*, 451 F.3d 768, 772-73 (11th Cir. 2006).

[28] Commentary does not have the force of a regulation and is not binding, and we do not regard it as such.

[29] In general, a credit reporting agency cannot report negative information for longer than seven years under 15 U.S.C. § 1681c.

date for internal purposes to determine when the information should be purged from the data that will appear on the consumer's credit report. *Id*. However, credit reporting agencies do not usually include that date on the credit reports provided to potential creditors or to consumers. *Id*. The plaintiffs in *Gillespie* argued that the "file" they received from Trans Union violated the disclosure requirements of the FCRA because it did not include the "purge date." *Id*. They claimed that the delinquency date was included in the definition of "file" contained in 15 U.S.C. § 1681a(g).

In rejecting that claim, the court reasoned that "Congress wanted consumers to receive exactly what [the plaintiffs] got from Trans Union— complete copies of their consumer reports, not their entire files in whatever form maintained by the [credit reporting agency]." *Id.* at 909. Since the purge date was an internal record-keeping item, used only to determine when transactions in a consumer's history should no longer be reported to those requesting credit reports, the court held that Congress did not intend to include it within the definition of "file." *Id.* at 910. That is not the situation here because the

OFAC alerts were far more than a mere internal record-keeping mechanism.[30]

We hold that information relating to the OFAC alert is part of the consumer's "file" as defined in the FCRA. Accordingly, we affirm the district court's order denying Trans Union's motion for judgment as a matter of law on Cortez's claim under 15 U.S.C. § 1681g based upon Trans Union's contention that the OFAC alert is not part of a consumer's file and not subject to the reporting requirements of the FCRA.

## D. Reinvestigation, 15 U.S.C. § 1681i

### 1. Reasonable Reinvestigation, 15 U.S.C. § 1681i(a)

Under 15 U.S.C. § 1681i(a)(1)(A), credit reporting agencies must promptly reinvestigate any information in a consumer's file that is disputed by a consumer and either record

---

[30] *Gillespie* also cited the Senate Committee Report discussing the 1996 amendments to the FCRA, which changed the requirement in § 1681g(a)(1) from providing the "nature and substance" of the information in a credit reporting agency's file to "all of the information" in the file. *See Gillespie*, 482 F.3d at 909. According to the Report, "The Committee intend[ed] this language to ensure that a consumer will receive a copy of that consumer's report, rather than a summary of the information contained therein." S. Rep. No. 104-185, at 41 (1995).

the current status of the information in dispute or delete it.[31]  In order for Cortez to establish that Trans Union is liable for failing to reinvestigate a dispute under that provision, she must establish that Trans Union had a duty to do so, and that it would have discovered a discrepancy had it undertaken a reasonable investigation.  Therefore, we must determine whether the jury could reasonably have concluded that Trans Union would have discovered the inaccuracy in Cortez's report – i.e., the OFAC alert – "if it had reasonably investigated the matter."  *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997).

Although the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute,

---

[31] 15 U.S.C. § 1681i(a)(1)(A) states, in relevant part:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

it is clear that a reasonable reinvestigation must mean more than simply including public documents in a consumer report or making only a cursory investigation into the reliability of information that is reported to potential creditors. *Id.* at 225. Rather, if the agency determines that the information is inaccurate, incomplete, or cannot be verified, it must delete or modify the information and notify the provider of the information that the information has been modified or deleted from the consumer's file. 15 U.S.C. § 1681i(a)(5)(A). Congress thought this protection so vital to the statutory scheme of the FCRA that it included a specific provision requiring credit reporting agencies to maintain procedures to prevent the reappearance of information that is deleted because it is misleading or inaccurate. 15 U.S.C. § 1681i(a)(5)(c).

Trans Union first argues that it should not have been liable under § 1681i because the OFAC alert is not part of Cortez's "file." We have already explained why that contention must be rejected.

Trans Union admits that it performed no reinvestigation to determine whether Cortez was the person named in OFAC's

SDN List. Trans Union concedes that it did not look beyond the name on that List before reporting a "match" on Cortez's consumer report. However, it attempts to escape liability by arguing that even if § 1681i does apply, any reinvestigation would have been meaningless because it cannot change OFAC's SDN List. *See* Trans Union Br. at 27. That argument is disingenuous at best. Trans Union controls the information it places on a consumer's credit report. Cortez did not ask Trans Union to alter OFAC's SDN List. Rather, she merely asked Trans Union not to associate that information with her and informed the company that she was not the person the OFAC alert referred to. She made that request four times - once by telephone and three times in writing. Trans Union responded by denying that the information was on her credit report. Furthermore, one of Trans Union's customer service managers testified at trial that it is Trans Union's policy never to investigate OFAC alerts, at least not until forced to do so by the consumer bringing a law suit. *Cortez*, 2007 WL 2702945 at * 2; *see also* J.A. 203. That is what happened here. After Cortez sued, Trans Union blocked the OFAC Alert from appearing on

60

her credit report. J.A. 183-84.

Similarly, Trans Union argues that it should not be liable under the FCRA because the responsibility for USA PATRIOT Act compliance falls on potential creditors and not credit reporting agencies. We are well aware that anyone involved in financial transactions has significant responsibilities under the USA PATRIOT Act, as noted above. However, nothing in the USA PATRIOT Act suggests that Congress intended the obligations arising under that Act to immunize credit reporting agencies from duties they would otherwise have under the FCRA. Once Cortez disputed the accuracy of the information in Trans Union's credit report, Trans Union was obligated to reinvestigate that information. The car dealer's responsibilities under the USA PATRIOT Act are simply irrelevant to Trans Union's duty under the FCRA; the district court recognized that when it denied Trans Union's motion for judgment as a matter of law.

**2. Failure to Note Dispute, 15 U.S.C. §§ 1681i(b) and (c).**

15 U.S.C. § 1681i sets forth a fairly specific process for disputing information in a credit report. As discussed above, a

consumer must first inform the credit agency that s/he disputes the information. 15 U.S.C. § 1681i(a)(1). The credit reporting agency must reinvestigate promptly based on that dispute. The agency must then appropriately respond to the dispute based on the results of its reinvestigation. This includes deleting or modifying disputed information when appropriate. *Id*. § 1681i(a)(5).[32] The credit reporting agency must also notify the consumer promptly of the results of the reinvestigation in writing. *Id*. § 1681i(a)(6). The minimum contents of that notice are prescribed by the statute. As relevant here, the notice must include: "(i) a statement that the reinvestigation is completed; (ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation; [and] . . . (iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information . . . ." *Id*. § 1681i(a)(6)(B).

"If the reinvestigation does not resolve the dispute," the

---

[32] The credit reporting agency may also determine that the dispute is frivolous or irrelevant under 15 U.S.C. § 1681i(a)(3), but that procedure is not relevant here.

consumer may file a statement of his or her dispute with the credit reporting agency. *Id*. § 1681i(b). "Whenever a statement of dispute is filed," the credit reporting agency "in any subsequent consumer report containing the information in question, [must] clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." *Id*. § 1681i(c). This allows "potential creditors [to] have both sides of the story [so that they] can reach an independent determination of how to treat . . . specific, disputed" information. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991).

Cortez claims that Trans Union was obligated to include notice of her dispute about the OFAC alerts in her credit report under § 1681i(c). As noted earlier, in a letter dated May 10, 2005, Trans Union told Cortez, "[O]ur records show that the information you disputed does not currently appear on your TransUnion credit report." J.A. 545. Thereafter, Trans Union twice issued Cortez's credit report with the misleading/erroneous OFAC alerts and without noting that Cortez was disputing those alerts. Trans Union does not deny

63

this. Its only argument is that Cortez never explicitly filed a statement of dispute under § 1681i(b) and thus, it had no obligation to include a statement in those subsequent credit reports under § 1681i(c). The argument once again is unconvincing.

In *Guimond*, the court explained that a § 1681i(c) claim requires a showing that (1) the plaintiff disputed an item in her file; (2) any reinvestigation conducted by the consumer reporting agency did not resolve the dispute; (3) the plaintiff filed a statement of dispute; and (4) the statement was not included with subsequent copies of her credit report. 45 F.3d at 1335. The court ultimately held that Guimond's § 1681i(c) claim failed because, although she met the first two elements of the claim, she failed to present evidence that she filed a statement of dispute. *Id.*[33]

Though we do not disagree with the above standard, this case is distinguishable and frankly, extraordinary. Trans Union

---

[33] Congress did not require that consumers submit disputes on specific forms, and any such technical requirement seems inconsistent with the remedial focus of the FCRA. *See Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 73 (1st Cir. 2008); *see also Cushman*, 115 F.3d at 223.

admits not only that it never reinvestigated Cortez's dispute, it concedes that it never intended to do so because of its fixed policy regarding OFAC alerts. Moreover, after Cortez had submitted one verbal and two written requests, Trans Union responded to her with a letter that stated, "After reviewing your correspondence, we were unable to determine the nature of your request." After Cortez wrote to Trans Union a third time, Trans Union responded to her that "the information you disputed does not currently appear on your Trans Union credit report." This final response by Trans Union to Cortez was patently false. Trans Union thwarted Cortez's ability to request that a statement of dispute be included in subsequent credit reports by telling Cortez that the disputed information was not in her report in the first place. Still, Cortez persisted. She restated her dispute even after she was falsely told that information was removed from her credit report, i.e., even after the reinvestigation was complete and she was misinformed by the credit reporting agency that the issue she had raised was resolved. Given that evidence, it was reasonable for the jury to conclude that Cortez had adequately informed Trans Union that its reinvestigation did not resolve her

dispute and that Trans Union failed to note that on her credit report, as required by the FCRA.[34]  Accordingly, we affirm the district court's decision denying Trans Union's motion for judgment as a matter of law on Cortez's § 1681i(c) claim.

Having concluded that the district court did not err in denying Trans Union's motions for judgment as a matter of law, and thus affirming the district court's refusal to overturn the jury's liability determination, we turn to Cortez's claim that the district court erred in reducing her punitive damage award. Although, as we will explain, we conclude that we must affirm that reduction, we are nevertheless troubled by it.

### III. DAMAGES

In her appeal, Cortez argues that she is entitled to reinstatement of the jury's punitive damages award because the district court did not have the authority to order the conditional remittitur, which she accepted under protest. In its cross-appeal, Trans Union argues that the punitive damages should not have

---

[34] Even though Cortez's claim is supported by numerous requests to the credit reporting agency, we do not suggest that a consumer must make more than one request to have notice of a dispute included in a credit report under 15 U.S.C. § 1681i(b) and (c).

been submitted to the jury, that the district court should have reduced the compensatory damages, and that the punitive damages are excessive even after the district court's remittitur.

## A. Remittitur

"[T]he remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). While courts often use the term "remittitur" to refer to any reduction in a damages award, including one which is imposed to satisfy constitutional due process concerns, the term is actually far more specific. In *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999), the Court of Appeals for the Eleventh Circuit explained the difference between a constitutionally reduced verdict and a remittitur:

> A constitutionally reduced verdict . . . is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to

> correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Id.* at 1331 (footnote and citation omitted); *see also Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049-50 (8th Cir. 2002).

Despite the differences between a constitutionally reduced verdict and a remittitur, it is misleading to suggest that a constitutionally required reduction in an award "is really not a remittitur at all" because numerous courts, including the Supreme Court, refer to it as such. *See, e.g., BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."); *see also Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 438 (7th Cir. 1992) ("Perhaps [ the plaintiff] has been misled by the dual meanings of 'remittitur'. Courts sometimes use this word to refer to an option between a reduced award and a new trial; at other times courts speak of any reduction as a remittitur."). The distinction is relevant here.

The remedies available to a court when reducing a jury award based upon due process concerns are not necessarily the

same as those available when a court exercises its discretion because it believes the amount of the award is inconsistent with the evidence in a case. The latter is conditional, and the court must offer a new trial as an alternative to a reduction in the award in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial. *See Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998) (per curiam).

In *Hetzel*, the Court explained that when a trial court determines that the evidence does not support the jury's general damages award, it "has no authority . . . to enter an absolute judgment for any other sum than that assessed by the jury . . . . without allowing petitioner the option of a new trial." *Id.* (quotation omitted). Thus, a court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence. These reductions are frequently referred to as conditional remittiturs. The same is not true when a court must reduce a damages award to avoid a denial of due process. In that case, the award is reduced as a matter of law and there is no interference with the Seventh Amendment right to have a jury

make findings of fact. *Gore*, 517 U.S. at 585-86. We review discretionary reductions in jury awards for abuse of discretion, *see Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354 (3d Cir. 2001), but we conduct *de novo* review of a trial court's constitutionally required reduction of damages. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 431 (2001).

The Supreme Court has further limited our review of conditional remittiturs like the one we have here. As we have just noted, the choice between a reduced award and a new trial is required by the Seventh Amendment, and a court cannot reduce an award without affording the plaintiff the option of a new trial. *See Hetzel*, 523 U.S. at 211. In *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648 (1977) (per curiam), the Supreme Court held that "a plaintiff in federal court . . . may not appeal from a remittitur order he has accepted" even where the plaintiff accepted the remitted award under protest. *Id.* at 650. Cortez argues for an exception to this rule under our decision in *Demeretz v. Daniels Motor Freight, Inc.*, 307 F.2d 469 (3d Cir. 1962).

In *Demeretz*, the district court gave the plaintiff twenty days to either submit to a new trial on damages or to agree to a reduction in the jury's verdict. 307 F.2d at 471. The plaintiff did not respond within twenty days, and the court entered a judgment in the amount of the reduced award. *Id.* The plaintiff appealed, arguing that it is "beyond the court's power," once the explicit time limitation in Rule 59(d) of the Federal Rules of Civil Procedure has expired, to order a new trial on a ground that the defendant did not raise in its motion for a new trial. *Id.* at 472.[35] Though the appeal of an order granting a new trial normally would be interlocutory, we held that under the Supreme Court's decision in *Phillips v. Negley*, 117 U.S. 665 (1886), the order was reviewable as a final judgment because the plaintiff was challenging the court's authority to act. *Demeretz*, 307 F.2d at 472. We held that the court did not have the authority to reduce the jury's award *sua sponte* because the order had not been entered within the time limit established under Rule 59(d). Rule 60 of the Federal Rules of Civil

_____

[35] When *Demeretz* was decided, a district court could not order a new trial under Rule 59 either *sua sponte* or for a reason not stated in a party's motion ten days after the entry of judgment. 307 F.2d at 472.

71

Procedure did not contain a similar limitation, but that Rule did not apply because the district court was not attempting to correct a clerical order or mistake. *Id*. at 473.

Cortez attempts to argue that since she conditioned her acceptance of the remittitur upon the court's legal authority to impose it, *Donovan* does not apply and she should be able to challenge the merits of the reduction in her punitive damages under *Demeretz*. She argues that, otherwise, "[she] would never, as a practical matter, be able to have her case decided by a jury or be able to have meaningful appellate review of any trial court errors." Cortez Reply Br. at 51.[36]

Cortez may be correct in claiming that she was on the horns of a dilemma and that the practical result of dismissing her challenge to the court's remittitur will be to place it beyond appellate review. Nevertheless, the Court held in *Donovan* that a plaintiff cannot challenge a remittitur s/he has agreed to, even

---

[36] Cortez also argues that the constitutionality of conditional remittiturs is questionable. Since conditional remittiturs have been recognized by the Supreme Court as early as 1886 without concerns being raised about their propriety, *see N. Pac. R. Co. v. Herbert*, 116 U.S. 642, 646-47 (1886), we can safely disregard that argument. *See also Johansen*, 170 F.3d at 1328-29.

if the plaintiff has only agreed under protest or pursuant to a purported reservation of rights. It is therefore clear that Cortez's challenge to the remittitur must be rejected notwithstanding the dilemma she found herself in. Her only course of action would have been to reject the remittitur and proceed to a second trial which could have been limited to the issue of damages. She would then be in the unenviable position of risking no punitive award at all.

The district court clearly had the authority to enter the September 13, 2007 conditional remittitur and Cortez's attempt to avoid the Supreme Court's decision in *Donovan* is meritless. She cannot now contest the merits of the district court's order reducing the jury's award of punitive damages.[37] Accordingly,

_____

[37] Because Cortez accepted the conditional remittitur, we do not need to reach the issue of whether the district court abused its discretion in reducing the punitive damages award from $750,000 to $100,000. We do note, however, that we are troubled by the court's reasoning in reducing the punitive damages. There is certainly nothing wrong with a jury focusing on a "defendant's seeming insensitivity" in deciding how much to award as punitive damages. *Id*. "Punitive damages awards are 'the product of numerous, and sometimes intangible, factors . . . .'" *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 195 (3d Cir. 2007) (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 457 (1993) (plurality opinion) (ellipsis in original)).
By their very definition, punitive damages are intended

we will affirm the district court's entry of judgment for $100,000 in punitive damages.

## B. Compensatory Damages

Unlike punitive damages that are intended to punish and deter, "[c]ompensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (3d Cir. 2003) (quotations omitted).

A jury can award actual damages for negligent violations

to punish a defendant; they are not intended to compensate the plaintiff. "[P]unitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (3d Cir. 2003). A jury can consider the relative wealth of a defendant in deciding what amount is sufficient to inflict the intended punishment. *See* Restatement (Second) of Torts § 908(2) (1979) (listing wealth as a factor which "can" be considered in determining punitive damages).

Common sense suggests that a corner "mom and pop" store should not be subject to the same punitive level of damages as a company worth close to a billion dollars. The latter would simply not be deterred by an award that might be large enough to put the former out of business. Moreover, the record certainly supports a jury becoming "incensed" over Trans Union's "insensitivity" to Cortez's claim, and we are hard pressed to understand the district court's reliance on that possible reaction to what Trans Union did, and/or considerations of Trans Union's fiscal wealth as reasons to reduce the punitive award.

of the FCRA and both actual and punitive damages for willful violations. 15 U.S.C. §§ 1681o, 1681n. "A jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award." *Thabault v. Chait*, 541 F.3d 512, 532 (3d Cir. 2008). We reverse a district court's decision on compensatory damages and grant a new trial only if the verdict is "so grossly excessive as to shock the judicial conscience." *Rivera v. V.I. Housing Auth.*, 854 F.2d 24, 27 (3d Cir. 1988) (quotation omitted). Although our review of a damage award is "exceedingly narrow," we have a "responsibility to review a damage award to determine if it is rationally based." *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1987). In doing so, we must view the facts in the light most favorable to Cortez. *Rivera*, 854 F.2d at 25.

We have already explained why this record supports the jury's determination of Trans Union's liability under: § 1681e(b), for failing to follow reasonable procedures that assured maximum possible accuracy in preparing Cortez's credit report; § 1681i, for failing to reasonably reinvestigate Cortez's

75

disputes and not indicating her dispute in her subsequent credit reports; and § 1681g, for failing to provide Cortez all of the information in her file when she made her request. Trans Union argues that the evidence Cortez presented was insufficient as a matter of law to support the compensatory damages award of $50,000 and, thus, the district court abused its discretion in failing to remit that award. We do not agree.

Cortez testified that she suffered severe anxiety, fear, distress, and embarrassment as a result of the erroneous OFAC alert and Trans Union's refusal to give her a corrected copy of her report. The anxiety caused her to feel compelled to warn a would-be creditor about the alert, which led to additional stress and embarrassment. There is also evidence that she suffered sleeplessness that required medication. She cried frequently because of the frustration from Trans Union's failure to acknowledge the issue. Cortez's daughter testified that Cortez was under extreme stress, that Cortez cried often and lost weight due to the stress regarding her credit report over the two-year ordeal, and that Cortez discussed her concerns about her credit report every time they spoke.

The psychological and stress-related suffering that Cortez had to endure is the very kind of injury that would be expected to result from erroneously associating a consumer with a "Specially Designated National." In allowing suits for damages, Congress certainly intended to allow compensation for the very kind of harm that the FCRA was intended to prevent. This is not legislation mandating a safety standard to prevent physical injury. It is legislation designed to facilitate banking and the extension of credit while protecting consumers from the kind of injury that will almost certainly result when erroneous information is inserted into a credit report. Thus, damages for violations of the FCRA allow recovery for humiliation and embarrassment or mental distress even if the plaintiff has suffered no out-of-pocket losses. *Philbin*, 101 F.3d at 963 n.3. Moreover, a consumer may be awarded actual damages even if she is able to obtain credit after explanation of the inaccuracy. *See Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F. Supp. 962, 969 (S.D. Ohio 1983). Time spent trying to resolve problems with the credit reporting agency may also be taken into account. *Stevenson v. TRW Inc.*, 987 F.2d 288, 297 (5th Cir.

77

1993).

The district court found that a compensatory award of $50,000 was "exceedingly generous" but concluded that it did not justify judicial interference. *Cortez*, 2007 WL 2702945 at *2. As stated above, the scope of our review here is exceedingly narrow. We agree with the district court that there is sufficient evidence in the record to support the jury's compensatory award.

Trans Union cites to *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001) and *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995) to argue that evidence similar to that proffered by Cortez was rejected by the Courts of Appeals for the Fifth and Second Circuits, respectively, as insufficient to support compensatory damage awards. Trans Union Br. at 36, 38-39. We are not persuaded.

First, Trans Union neglects the fact that in both of those cases, the plaintiffs failed to show that the defendants' credit reports were the cause of the plaintiffs' emotional distress. *See Cousin*, 246 F.3d at 370 (holding that the plaintiff failed to show that Trans Union's credit report was the cause of emotional distress where there were reports from multiple agencies at

play); *Casella*, 56 F.3d at 474-75 (holding that the plaintiff failed to show that the defendants' credit reports as opposed to the city of San Diego, which was wrongly reporting that defendant owed child support, were the cause of the plaintiff's emotional distress). That is not the situation here.

Second, we have not adopted, and now refuse to adopt, the Fifth Circuit's standard requiring "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." *Cousin*, 246 F.3d at 371 (quotation omitted). Such corroboration goes only to the weight of evidence of injury, not the existence of it. If a jury accepts testimony of a plaintiff that establishes an injury without corroboration, the plaintiff should be allowed to recover under the FCRA. The fact that the plaintiff's injuries relate to the stress and anxiety caused by the defendant's conduct does not change that. This is precisely the kind of injury that Congress must have known would result from violations of the FCRA.

Furthermore, our review of other awards reinforces our belief that the award here was not excessive, and that the district

court did not abuse its discretion in deciding not to reduce the compensatory award. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) (affirming jury award of $200,000 for economic and emotional damages based on loss of economic opportunity in the home mortgage market, emotional distress, and loss of income for approximately 300 hours spent addressing errors in the plaintiff's credit report); *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 505 (4th Cir. 2007) ("A survey of the other, more recent FCRA cases that involve requests for remittitur of emotional distress awards suggests that approved awards more typically range between $20,000 and $75,000."); *Stevenson*, 987 F.2d at 298 (affirming "award of $30,000 in actual damages based upon the finding of mental anguish," which is the equivalent of over $45,000 in 2010).[38]

The jury obviously found the testimony of Cortez and her daughter credible and accepted their evidence that Cortez suffered considerable anxiety, emotional distress, and humiliation as a result of being associated with a government

---

[38] Equivalent value calculated using the Inflation Calculator of the Department of Labor's Bureau of Statistics. *See* http://data.bls.gov/cgi-bin/cpicalc.pl (visited on May 3, 2010).

list that includes people who are identified as terrorists. Indeed, in the post-9/11 world, neither that conclusion nor the emotional impact of being associated with a list that may well contain terrorists should come as any surprise. Viewing the facts in the light most favorable to Cortez, as we must, we conclude that the jury could reasonably have attributed significant emotional distress to the Kafkaesque world in which Cortez found herself when she tried to dispute the OFAC alert and Trans Union refused to acknowledge that the information even existed. Accordingly, we affirm the district court's decision denying Trans Union's motion to remit the $50,000 compensatory damage award.

### C. Trans Union's Challenge to the Punitive Damages

We have already explained why Cortez's appeal of the reduction of the punitive damages is meritless. Trans Union appeals the award of any punitive damages. Its challenge is also meritless.

Trans Union argues that is was entitled to judgment as a matter of law on Cortez's willfulness claims because Trans Union's determination that the OFAC information was not

governed by the FCRA, even if it were erroneous, was neither objectively unreasonable nor reckless. Trans Union also argues that the punitive damages award, even as remitted, is unconstitutional. As previously noted, we review the decision by district courts to remit damage awards for abuse of discretion. *Evans*, 273 F.3d at 354. We review *de novo* a trial court's determination regarding the constitutionality of a punitive damages award. *Campbell*, 538 U.S. at 418.

In *Safeco Insurance Co. of America v. Burr*, the Supreme Court held that willful violations of the FCRA are assessed for "reckless disregard." 551 U.S. 47, 60, 69 (2007); *see Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 192 n.8 (3d Cir. 2009).[39] According to the Court:

---

[39] The Supreme Court's decision in *Safeco* defined the standard for all willful violations of the FCRA. *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009) ("To prove a willful violation, a consumer must prove that a consumer reporting agency either knowingly or recklessly violated the requirements of the [Fair Credit Reporting] Act.") (citing *Safeco*, 127 S. Ct. at 2208); *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) (applying *Safeco* willful standard to violations of the FCRA by creditors); *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 725-26 (7th Cir. 2008) ("[S]tatutory damages are available only for willful violations of the Act, and the Supreme Court held in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), that this means recklessness – something

> [A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

*Safeco*, 551 U.S. at 69. The fact that Trans Union's actions rest upon a legal conclusion does not immunize it from liability for reckless conduct under the FCRA. A credit reporting agency may act in reckless disregard of a statute's requirements by adopting an objectively unreasonable interpretation of the law. *Id.* Although the Supreme Court has suggested that a dearth of authoritative guidance may hinder a party's efforts to interpret the law reasonably, *id.* at 70, Cortez correctly notes that the lack of definitive authority does not, as a matter of law, immunize

more than negligence but less than knowledge of the law's requirements."). In *Perez v. Trans Union, LLC*, 526 F. Supp. 2d 504 (E.D. Pa. 2007), the district court wrongly applied our prior standard, under which a plaintiff alleging a willful violation of § 1681e(b) was required to show that defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Id.* at 510 (quoting *Philbin*, 101 F.3d at 970). The district court applied that standard holding that the Supreme Court's decision in *Safeco* was limited to the section of the FCRA at issue in that case. We clarify here that *Safeco*'s standard defining willful applies to all violations of the FCRA.

83

Trans Union from potential liability.

A credit reporting agency may also willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA. Here, notwithstanding the conclusion of Trans Union's lawyers, the breadth and scope of the FCRA is both evident and extraordinary. As we explained at the outset, it refers to "all" information, wherever it may be stored, that is intended to be used or that may be used in extending credit. Moreover, it is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it. *See Sullivan*, 520 F.3d at 73; *see also Cushman*, 115 F.3d at 223. We have no trouble concluding that, given the totality of circumstances surrounding the OFAC alert, Trans Union "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69.

Trans Union correctly reminds us that we are the first court of appeals to address whether the FCRA applies to information from OFAC's SDN List in the form of an alert

84

reported by a credit reporting agency. This does not, however, result in a borderline case of liability as Trans Union suggests. It merely establishes that the issue has not been presented to a court of appeals before. The credit agency whose conduct is first examined under that section of the Act should not receive a pass because the issue has never been decided. The statute is far too clear to support any such license.

Furthermore, the verdict of this lay jury reveals an understanding of the distinction between negligent and willful. The jury found Trans Union negligent in its violation of § 1681e(b) for failing to have reasonable procedures to assure maximum accuracy of the information in Cortez's report. In other words, in its initial preparation of the credit report with the OFAC alert, where Trans Union relied on Accuity's matching technology, the jury found that Trans Union did not act with reckless disregard to Cortez's rights. *See, e.g.*, *Casella*, 56 F.2d at 475 (holding that where San Diego re-reported false child support liability, credit reporting agencies did not willfully violate § 1681e(b) when they reported that liability on the plaintiff's credit report). However, the jury found that Trans

Union willfully violated §§ 1681g and 1681i in its responses to Cortez's request for a copy of her complete credit report and her request for reinvestigation. Trans Union categorically denied that the OFAC alert information was on Cortez's report, even though it continued to report that information to potential creditors and failed to include any statement in the report that Cortez disputed the OFAC information. The record clearly supports the jury's reasoned determination that Trans Union was not "merely careless" in failing to recognize that the FCRA governed the OFAC information it was reporting.

In attempting to overturn the punitive damages award, Trans Union repeats its argument that the OFAC information was not part of the consumer's "file." We have already disposed of that argument, and need not discuss it again. We do think it is worth reiterating that the OFAC regulations and the Treasury Department's website both indicate that OFAC information in a credit report is in fact governed by the FCRA. That website goes as far as to mention that the FCRA and the FTC provide consumers with a remedy when an invalid OFAC Alert is on their credit reports. *See*

http://www.treas.gov/offices/enforcement/ofac/faq/answer.sht ml#consumer2 (visited June 17, 2010) ("How Can I Get The OFAC Alert Off My Credit Report? A consumer has the right under the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 et seq., to request the removal of incorrect information on his/her credit report. To accomplish this, consumers should contact the credit reporting agency or bureau that issued the credit report."). Even a cursory look at that website should have informed Trans Union of the perils of its approach to OFAC alerts.

Trans Union argues that because the FTC, and not the Treasury Department, is the agency authorized to enforce the FCRA, the Treasury Department's conclusions about the FCRA are not relevant. That argument only bolsters our belief that the jury acted reasonably in concluding that Trans Union's actions were not "merely careless" but were with reckless disregard to the law. The jury may well have concluded that Trans Union made a strategic decision to include OFAC information in the manner it did because the OFAC alert was a separate product that could be sold to customers at additional cost.

When considered together with our analysis in support of

the jury's finding of liability, we easily conclude that Trans Union substantially risked acting in violation of the law when it made the policy decision to exclude OFAC information from its FCRA compliance. Although such a finding cannot be made lightly, especially in a case of first impression, it is imperative that we do not allow "a company that traffics in the reputations of ordinary people" a free pass to ignore the requirements of the FCRA each time it creatively incorporates a new piece of personal consumer information in its reports. *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1071 (9th Cir. 2008).

Finally, Trans Union argues that the remitted punitive damages award violates its due process rights under the 14th Amendment. We review the award *de novo* to determine whether the award of punitive damages is "grossly excessive or arbitrary." *Campbell*, 538 U.S. at 416. In *Campbell*, the Supreme Court summarized the three guideposts a court reviewing punitive damages should consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between

the punitive damages award by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *Gore*, 517 U.S. at 575).

The district court's remitted award of $100,000 does not even begin to approach the outer limit of punitive damages "aimed at deterrence and retribution" allowed by the Constitution. *Id.* at 416.

In terms of reprehensibility, the first guidepost, Trans Union ignored "the overwhelming likelihood of liability" and contorted its policies to avoid its responsibilities under the FCRA. *Id.* at 419. Trans Union also repeatedly failed to acknowledge to Cortez that the OFAC Alert was in her credit report when it knew that the information was being reported to its subscribers. *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 467 (3d Cir. 1999) (the degree of reprehensibility of a defendant's conduct includes whether the conduct "involves deliberate false statements rather than omissions"). Moreover, although Cortez did not suffer severe physical harm, the gravity of harm that could result from Trans Union's "match" of Cortez with an individual on a "terrorist" list cannot be over stated.

This is especially true because Trans Union's subscribers rely on the accuracy of the detailed personal information Trans Union provides. Given the severe potential consequences of such an association, Trans Union's failure to take the utmost care in ensuring the information's accuracy – at the very least, comparing birth dates when they are available – is reprehensible.

The damages award also survives scrutiny under the second guidepost. An award that is twice the compensatory damages award falls well within the Supreme Court's standard for ordinary cases of a single-digit ratio. *Campbell*, 538 U.S. at 425.

Finally, we agree with the parties that the third guidepost is not useful in the analysis of punitive damages here as there is no "truly comparable" civil penalty to a FCRA punitive damages award. Cortez Reply Br. at 46; Trans Union Reply Br. at 23-26.

Accordingly, we affirm the district court's remitted punitive damages award of $100,000.

### IV. CONCLUSION

In summary, we affirm the district court's orders denying

90

Trans Union's motion for judgment as a matter of law and entering a remitted judgment, including $50,000 in compensatory damages and $100,000 in punitive damages, against Trans Union.